## THE PEOPLE *ex rel.* A. C. Badger

*v.*

## BERTHOLD LŒWENTHAL *et al.*

| 93 | 191 |
| 24a | 540 |
| 93 | 191 |
| 125 | 596 |
| 93 | 191 |
| 127 | 127 |
| 93 | 191 |
| 39a | 225 |
| 93 | 191 |
| 215 | 8288 |

1.   "BANKING POWERS" *of corporation—within the meaning of the constitution of* 1848.   The act of the legislature of 1867, to incorporate the International Mutual Trust Company, giving it power to have, hold and loan money, and to buy or sell exchange, bills, notes, bonds and other securities, and to issue letters of credit, is not in violation of section 5 of article 10 of the constitution of 1848, because not submitted to and approved by a vote of the people.

2.   While such corporation is invested with some banking powers, it has not full banking powers, as it is not authorized to issue bank notes to circulate as money.   The words *"with banking powers,"* as used in section 5 of article 10 of the constitution of 1848, which provides that no act of the General Assembly authorizing corporations or associations with such powers shall go into effect, or in any manner be in force, unless the same shall be submitted to a vote of the people, and approved by such vote, mean with power to issue notes to circulate as money.   It was not intended by such section to prohibit the conferring of some of the other banking powers upon corporations without a vote of the people.

·3.   SAME—*with banking powers recognized by present constitution.*   The provisions of sections 2, 5 and 7 of article 11 of the present constitution may properly be regarded as a constitutional recognition of pre-existing corporations with banking powers.

4.   CONSTITUTION OF 1848 CONSTRUED—*objects of sections 2 and 4 of article* 10.   The object and purpose of sections 2 and 4 of article 10 of the Constitution of 1848 was to make some provision of security for the debts and liabilities of all private corporations, section 4 applying to corporations possessing banking powers, and section 2 to all others.

5.   Section 5 of article 10 is to be read and construed in connection with the preceding section, which relates to banks of issue in express terms.   The 4th section relates to the individual liability of stockholders in banks of issue, and the 5th provides for the mode in which such corporations having power to issue paper money shall be created.

6.   CONSTRUCTION—*when resort may be had to.*   Where the words of a constitutional provision admit of doubt as to the sense in which they were employed, resort may be had, not only to the context, but the courts may also consider the evil intended to be remedied, contemporaneous exposition, and the consequences to follow.

7.   SAME—*contemporaneous.*   Great weight is to be attached to contemporaneous exposition of statutes or constitutional enactments, and a long acquiescence in a particular construction by all departments of the government gives it almost the force of a judicial exposition.

8. STATUTE—*construction—from consequences.* Where there has been a practical construction which has been acquiesced in for a considerable period by the public and officers in the discharge of their duties, and rights have accrued in reliance upon it which would be divested by holding such construction erroneous, and large interests are involved in sustaining this construction, and the true construction is a matter of doubt, the argument *ab inconvenienti* is allowed to have great weight.

9. SAME—*whether title expresses subject.* The act entitled "An act to incorporate the International Mutual Trust Company," adopted in 1867, is not in violation of the provision in the constitution of 1848, that "no private or local law which may be passed by the General Assembly shall embrace more than one subject, and that shall be expressed in the title." Such act does not embrace more than one subject, and that is embraced in its title,—that is, the subject of a creation and administration of a trust fund, and the powers given are incidental and auxiliary thereto.

10. SAME—*of the passage of laws—in which House amendments to a pending bill appear to have been made.* A bill originating in the Senate was read twice in that body, and then amended by the Senate and ordered to be engrossed for a third reading. Some days afterward the bill came up in the Senate and was regularly passed, and sent to the House, asking its concurrence in the passage of the bill. There was no report of the committee, or other entry in the Senate journal, more than such order for engrossment, tending to show that the bill was in fact engrossed before its passage. In the House, the amended bill as passed by the Senate was read a first and second time and referred to a committee, and afterwards a member of that committee "reported the same back with amendments, and recommended its passage as amended," and it was passed; and the House then "ordered that the clerk inform the Senate thereof," and the clerk of the House reported to the Senate that he was directed to inform the Senate that the House had concurred with them in the passage of the bill "amended as per amendments attached thereto." On the objection that there were amendments made to the bill by the House which were not duly concurred in by the Senate, it was *held,* it did not sufficiently appear that the bill was amended in the House at all.

11. SAME—*presumption—burden of proof.* Where an act of the legislature appears signed by the speakers of both houses, and approved by the Governor, and it is duly published as a law of the State, the presumptions should all be in its favor as a law duly passed. The burden is upon the party assailing the validity of the act in this respect, to show its invalidity, and make out a case.

APPEAL from the Criminal Court of Cook county; the Hon. HENRY BOOTH, Judge, presiding.

Mr. L. MILLS, State's Attorney, Mr. W. T. BURGESS, and Mr. W. FULLER, for the appellants.

Messrs. ROSENTHAL & PENCE, for the appellees.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

In the year 1867, the General Assembly of this State passed and the Governor approved an act to incorporate "The International Mutual Trust Company," with a capital of $500,000, which charter granted the right to have, hold and loan money, and to buy or sell exchange, bills, notes, bonds or other securities, and issue letters of credit. Also to hold real estate needful in the transaction of its business, and to take and hold real estate in trust as security for the payment of loans and debts due the corporation. See ·Private Laws, 1867, vol. 1, p. 95.

Said corporation was organized in the year 1868, and has, from that time to this, been engaged in· the business of dealing in money, loaning out its own funds on security ; and in receiving deposits of money from others, and loaning the same on approved securities ; and also, in buying and selling exchange, notes, bonds and other securities.

On the 16th day of May, 1879, the State's attorney for the county filed in the Criminal Court of Cook county a petition for leave to file an information in the nature of a *quo warranto,* alleging in the petition that the provisions of said charter are obnoxious to the 5th section of article 10 of the constitution of 1848, in that the powers conferred are "banking powers," and that the act in question was never submitted to a vote of the people. That the name of the corporation was changed in June, 1872, under the general statute, to that of the International Bank. That the defendants, Lœwenthal and others, claim that a corporation was duly organized under said charter; that the act in question was constitutional, and that they, under said charter, and in the name last aforesaid, are exercising the powers conferred by that charter, and requiring them to show by what warrant they do so.

The defendants answered showing cause, admitting the allegations of fact in the petition, and averring that the statute under which the corporation was organized was constitutional

13—93 ILL.

and valid, although it had not been submitted to a vote of the people. They also allege that since the adoption of the constitution of 1848, about 175 charters or statutes have been passed, establishing corporations with like powers as those conferred upon the said International Mutual Trust Company, without having been submitted to a vote of the people, giving the list of them in an exhibit attached.

That about thirty suits have been brought by or against the various corporations mentioned in the exhibit, which have been taken to the Supreme Court of the State, a list of which is contained in another exhibit, and that a large number of suits have been brought by or against such corporations which have not been taken to said Supreme Court, and that all the courts of this State have, for twenty-eight years, practically construed and treated said corporations as constitutional and valid; and that particularly the corporation in question had had five suits in this court, in no one of which was the validity of the charter questioned.

That the legislature of the State has recognized such corporations in its revenue laws, and collected large sums of money from them, and that this corporation has paid large sums of money as taxes under the revenue laws of the State. That the constitution of 1870 recognizes and treats as valid all the corporations organized with banking powers under special statutes before that time passed by the legislature of the State.

That the assets of the corporation in question amounted to over $1,600,000.

That the Merchants' Savings, Loan and Trust Company of Chicago was organized in 1857, under a similar charter, and has been since doing business as a bank, and its assets at the present time are at least $5,000,000; and that there are other banks in Chicago doing business under a like private charter.

The criminal court, upon hearing the case, denied leave to file the information, and the relator appealed to this court.

The main question which is presented is as to the repug-

nancy of the charter in question to the fifth section of article 10 of the constitution of 1848, in the respect of its not having been submitted to and approved by a vote of the people.

Article 10 of that constitution, in full, is as follows:

§ 1.   Corporations not possessing banking powers or privileges may be formed under general laws, but shall not be created by special acts, except for municipal purposes, and in cases where, in the judgment of the General Assembly, the objects of the corporation can not be attained under general laws.

§ 2.   Dues from corporations not possessing banking powers or privileges, shall be secured by such individual liabilities of the corporators, or other means, as may be prescribed by law.

§ 3.   No State bank shall hereafter be created, nor shall the State own or be liable for any stock in any corporation or joint stock association for banking purposes, to be hereafter created.

§ 4.   The stockholders in every corporation or joint stock association for banking purposes, issuing bank notes, or any kind of paper credits to circulate as money, shall be individually responsible, to the amount of their respective share or shares of stock in any such corporation or association, for all its debts and liabilities of every kind.

§ 5.   No act of the General Assembly, authorizing corporations or associations with banking powers, shall go into effect, or in any manner be in force, unless the same shall be submitted to the people at the general election next succeeding the passage of the same, and be approved by a majority of all the votes cast at such election for and against such law.

§ 6.   The General Assembly shall encourage internal improvements, by passing liberal general laws of incorporation for that purpose.

The corporation in this case is given the power to loan money, to buy or sell exchange, bills, notes, bonds or other securities; to have and hold money and issue letters of

credit; and so unquestionably has some banking powers; but it has not full banking powers, as it is not authorized to issue bank notes to circulate as money.

Is it a corporation with banking powers, in the sense in which the words " banking powers " are used in section 5 of said article 10? We are not to rest upon those words alone, as they are found in that section, for their meaning, but we are to view them in connection with the context. This article 10 is entitled Corporations, and it evinces the purpose, we think, to make some provision of security for the debts and liabilities of all private corporations.

Section 2 provides for the case of corporations not possessing banking powers, by saying that dues from such corporations shall be secured by such individual liabilities of the corporators, or other means, as may be prescribed by law. This leaves one class of corporations, viz: those possessing "banking powers," unprovided for in this respect of security. Section 4 then comes in and provides for this class—the class possessing banking powers—by saying that the stockholders in every corporation, or joint stock association for banking purposes, issuing bank notes to circulate as money, shall be individually responsible to the amount of their stock for the debts and liabilities of the corporation. In this mode, we think, security was provided for as to the dues from all private corporations. Section 2 doing so as to all corporations, except those possessing banking powers, and section 4 making the provision in regard to the excepted class in section 2, viz: those possessing banking powers; so that the two sections together provide as to all private corporations. If this be not so, and it be taken that as section 4 relates only to corporations issuing bank notes to circulate as money, the two sections together do not include that species of corporations possessing only the banking powers of receiving deposits and making discounts, then the framers of the constitution did the very absurd thing of making express provision in regard to the securing of the dues from all private corporations, except

those possessing the banking powers merely of deposit and discount, leaving the latter, alone, wholly unprovided for in this respect.   There is no reason for such a discrimination in respect to banks of deposit and discount merely, and we can not impute to the framers of the constitution the absurdity of making or intending any such distinction.

If we hold then, as we think we reasonably must, that it was the intent of these two sections to make this provision as to security of dues, in respect to all private corporations, not excepting any, we arrive at the sense in which the words " banking powers " were used in section 2.  Section 4 would then provide for the case of corporations possessing banking powers, and section 2 for the case of all other corporations.  But by what language does section 4 provide for the case of corporations possessing banking powers?  It is this:  " The stockholders in every corporation, or joint stock association for banking purposes, issuing bank notes, or any kind of paper credits to circulate as money," etc.   Thus showing that the words " corporations possessing banking powers," employed in section 2, and " corporations issuing bank notes to circulate as money," employed in section 4, are used interchangeably, as meaning the same thing, and that corporations with banking powers, in the sense in which the words banking powers are used in section 2, mean banks of issue.

If such, then, be found to be the sense in which the words banking powers are used in section 2, we may well conclude that they were used in the same sense in section 5.   That when that section enacts, that no act of the General Assembly authorizing corporations or associations with banking powers shall go into effect unless submitted to and approved by a vote of the people, it means by corporations with banking powers, corporations issuing bank notes to circulate as money, and relates to banks of issue.

Section 5, in question, is to be read in connection with section 4.   Section 4 relates to banks of issue in express terms.  Immediately following this section 4 relating to banks of

issue, comes the 5th section. The 4th section relates to the liability of stockholders in banks of issue, and then in the 5th section follows the method for the creation of corporations with banking powers. Is it not the natural construction of the language of the 5th section in such connection, that the corporations there named, with banking powers, mean the same corporations as are mentioned in the immediately preceding section 4, viz: banks of issue—that the one section provides for the individual liability of the stockholders in banks of issue, and the other provides as to the mode of creation of such banks—the two sections each making a provision of safeguard with respect to this particular species of corporations—banks of issue.

Words often have a popular sense different from their strict technical import, and courts not infrequently are called upon, in the construction of language, to hold that words are used in a popular sense where they have a different technical meaning. The case of *Comstock et al.* v. *Gage,* 91 Ill. 328, is an instance, where it was a question whether the city treasurer of Chicago had committed a criminal offence in the violation of a provision of the city charter against the loaning of the public money, by making a deposit of it in bank. And it was held that although strictly and technically the deposit was a loan of the money to the bank, it was not in the popular sense of the term, and that the word loan was used in the charter in its popular sense.

And it is regarded here, that the popular understanding of a bank, or an institution with banking powers, is that of a bank of issue, and that there is reason to believe that the words banking powers, in this case, were employed in accordance with such popular understanding.

We think that enough of doubt thus arises to make room for construction, and to render legitimate the resort to other aids in the construction of this language of " corporations with banking powers " as used in this article of the constitution,—

such as the evil to be remedied, contemporaneous exposition, and the consequences to follow.

Previous to the time of the constitutional convention of 1847, there had not, as we believe, been in the State any incorporated bank purely of deposit and discount, with may be the single exception of a bank at Kaskaskia. The banks of the State and the Territory previous had been banks of issue, and their history had been most calamitous.

In *The People* v. *Marshall et al.* 1 Gilm. 682, in reference to the construction of a clause in the constitution of 1818 in regard to banks, this court used the following language : " This construction of the constitution is warranted, not only by its language, but also by a consideration of the evils we may suppose its authors intended to guard against. By reference to the history of the country just before and about the time of the adoption of the constitution, it will be seen that it was overwhelmed with independent banks, most of them insolvent, or daily expected to become so, and as a necessary consequence the paper of almost all of them greatly depreciated. These evils were in the mind of the convention, and admonished it to guard against their recurrence in future."

In Brown's history of the State, written in 1844, the author says: " All the banks in Illinois have ceased to be. Their history is brief, their story is instructive, and the lesson taught will long be remembered. Under the territorial government three banks were chartered : one at Shawneetown, one at Edwardsville, and one at Cairo. There was also a bank at Kaskaskia; of the latter it is needless now to speak; it issued no bills, and of course defrauded no man. We regret our inability to say as much in favor of the others," p. 428. Again, speaking of the old State Bank, he says, " the plates, like those of the Mormon prophet, constituted all of its capital. * * * It had hardly commenced business before its bills fell to seventy cents on the dollar, and soon thereafter to fifty. They at length fell to twenty-five cents, when they ceased to circulate. * * * A currency composed entirely of irredeemable

paper flooded the country and expelled the precious metals."
pp. 431, 432.

Such had been the widespread ruinous effects which had been
produced by banks of issue—paper money, the issue of such
banks, every day perishing and turning to ashes in the hands
of the people—and in view thereof, and as a safeguard against
their recurrence, we may suppose these two constitutional pro-
visions to have been adopted : that in section 4, for the indi-
vidual liability of stockholders to the amount of their stock
in banks of issue; and that in section 5, that no such bank
should be chartered without the sanction of a vote of the
people.

The evil from banks which had been felt, and which we may
well suppose was deemed necessary, and was attempted to be
guarded against, was in respect of banks of issue alone.    It
was only of banks of this kind that there was occasion, from
experience, to declare in the constitution there should be none
more such, unless the people by their vote said so.

That the legislature have passed and the Governor approved
the large number of like charters, as set forth in respondent's
answer, commencing with the first legislature in 1849 passing
one such charter, and the second in 1851 passing several such
charters, and so down, is not questioned on the part of the
relator; nor that there have been the various suits at law in
the courts of this State as set forth in the answer, where this
question of constitutionality was never raised.    This is a con-
temporaneous and practical construction of the constitution
of 1848 in this respect which is entitled to great weight.

Great regard ought, in construing a statute, to be paid to
the construction which the sages of law who lived about the
time or soon after it was made, put upon it, because they were
best able to judge of the intention of the makers.    It is more-
over a maxim, that *contemporanea expositio est fortissima in
lege.*    4 Bac. Abr. Stat. 648.

In *Cohens* v. *Virginia,* 6 Wheat. 264, Chief Justice MAR-
SHALL says :"Great weight has always been attached, and very

rightly attached, to contemporaneous exposition.  *  *  *
This concurrence of statesmen, of legislators, and of judges in
the same construction of the constitution, may justly inspire
some confidence in their construction."

The case of *The People* v. *Dayton,* 55 N. Y. 377, is quite
like the present in the facts of practical construction, where
the court say : "Every year from 1853 to the present time,
the legislature has passed acts of a character similar to the one
in question, which have received the approval of the executive,
and been acted upon by State officers without challenge, so
that for nearly twenty years, through all the changes of public
officers, a practical construction has been given to the clause
in question, in accordance with the views here indicated.   The
practical construction of the clause in question by the legisla-
ture, commencing with the adoption of the amendment of 1853,
and continued to the present time, which has been acquiesced
in and acted upon by the executive and administrative depart-
ments of the government, and which, so far as we know, has
never before been questioned, is entitled to great, and we
think controlling weight in its interpretation.   It has almost
the force of a judicial exposition (Story on Const. § 408,) and
unless such legislation and practice are manifestly in violation
of the words used, the greatest weight should be given to it
in construing them.   Cooley Const. Lim. 67 and cases cited."

And in *The People* v. *Marshall, supra,* 680–81, this court
said : "It may also be observed that the legality of this char-
ter has been recognized by various acts of the legislature and
the reiterated action of other departments of the government
for upwards of twenty years.   And in addition to this evi-
dence in its favor, it is expressly recognized by the constitu-
tion, in terms which, if not understood as direct confirmation,
must be understood as such by necessary implication.   They
clearly indicate the sense of the convention as to its legal ex-
istence and its intention that it shall be continued.   This con-
stitutional sanction of the bank we think must put to rest all
question in relation to its legality."

In this connection, and in view of the latter remarks, may properly be considered the claim made here, that the constitution of 1870 recognizes and treats as valid all the corporations organized with banking powers under special statutes before that time.    The provisions of the constitution of 1870, relied upon to this end, are the following.    Section 2, article 11, reads:

"All *existing charters* or grants of special or exclusive privileges, under which organization shall not have taken place, or which shall not have been in operation within ten days from the time this constitution takes effect, shall thereafter have no validity or effect whatever."

It is said that in this section, by strong implication, all then existing charters or grants made by the General Assembly, under which there had been an organization, are recognized as valid.

Section 5 of that article provides that the State shall never own "any stock in any corporation or joint stock company or association for banking purposes, *now* created, or to be hereafter created."

Section 7 of the same article says: "Every banking association *now,* or which may hereafter be organized under the laws of this State, shall make and publish a full and accurate quarterly statement of its affairs (which shall be certified to under oath by one or more of its officers) as may be provided by law."

This last section it is said, not by implication alone, but directly, recognizes the existence of these banking corporations which had been created by act of the legislature, and by express provision brings them under control of the law.

It is answered to the above, that at the time of the framing and adoption of the constitution of 1870, there were many banks in the State *legally* organized under the general banking law of 1851, and that the language in the foregoing sections, "All *existing* charters," "corporations for banking purposes *now* created," and "every banking association *now*

organized under the laws of this State," refers only to *lawfully* existing charters, and to banks legally organized under that general banking law.

It would hardly be pretended, we think, that under section 5, last quoted, the State could own any stock in any of these banking corporations we are considering, or that such corporations would be exempt from the requirement in section 7, to publish quarterly statements of their affairs, but that such corporations would be held to be embraced within the meaning, as they are comprehended in the general terms of those sections.

It is not to be supposed that the members of the constitutional convention were not aware of the then existence of these many banking institutions in the State which had been created by act of the legislature without submission to a vote of the people; and it may be reasonably considered that they fell in with the uniform contemporaneous and practical construction of the constitutional validity of their charters, and that in the framing and adoption of the several provisions of the constitution relating to then existing banking institutions, there was had in mind and intended to be included all the recognized banks of the State—all *de facto* banks then existing which had been organized under special charters granted by the legislature. We think these provisions may not improperly be viewed as a constitutional recognition of these banking institutions.

In view of the number of these corporations with banking powers, the large amounts of capital invested, and the important interests involved in them, it may well be conceived that the consequences of declaring their charters to be unconstitutional and void, would be disastrous in the extreme. In a case of doubt, the argument *ab inconvenienti* is admissible, and has weight.

Cooley, in his work on Const. Lim. p. 67, says: "But where there has been a practical construction which has been acquiesced in for a considerable period, considerations in favor

of adhering to this construction sometimes present themselves to the courts, with a plausibility and force which it is not easy to resist.   \*   \*   \*   Where this has been given by officers in the discharge of their duty, and rights have accrued in reliance upon it, which would be divested by a decision that the construction was erroneous, the argument *ab inconvenienti* is sometimes allowed to have very great weight."

In the *Matter of the will of Warfield*, 22 Cal. 71, the court say: "Courts feel themselves constrained to uphold, when it is possible, contemporaneous interpretation of statutes, under which interpretation rights of property have for many years been acquired. *Rogers* v. *Goodwin*, 2 Mass. 477; *Stuart* v. *Laird*, 1 Cranch, 299." And in *The People* v.*Marshall*, before cited, p. 688, this court, in speaking of the results of declaring unconstitutional a bank law, say: "The magnitude and pernicious character of these results are sufficiently obvious without any remarks.   They are such as the court can not, and ought not to close its eyes to, neither should they be allowed to exercise an influence further than they are calculated to illustrate the intention and true construction of the constitution.   Thus far they are entitled to weight, for the rule is well established that where the consequences of a particular construction of the constitution or law would render its operation mischievous, that construction should be avoided, provided it is susceptible of a different one."

All considered, we reach the conclusion that a sound construction does not require that we should pronounce the act of the legislature in question unconstitutional because of its not having been submitted to a vote of the people.

There are two minor objections made against the act of incorporation.   One is, that it is a violation of the provision of the constitution of 1848, that "no private or local law which may be passed by the General Assembly shall embrace more than one subject, and that shall be expressed in the title."   The title of this act is "An act to incorporate the International Mutual Trust Company."

It is said that the body of the act confers banking powers, and nothing else. But such banking powers as are conferred by this act may be held as not improperly pertaining to the purpose and object of a mutual trust company. We do not perceive that the act can be truly said to contain more than one subject, or that that is not expressed in the title, viz: the subject of a creation and administration of a trust fund, and the powers given are incidental and auxiliary thereto. We think the words mutual trust company describe with sufficient fullness the functions and objects of the institution as set out in the charter. The law, in the respects named, is sustained, we think, by the following cases: *Belleville R. R. Co. v. Gregory,* 15 Ill. 20; *Neifing* v. *Town of Pontiac,* 56 id. 172; *O'Leary* v. *County of Cook,* 28 id. 534; *Prescott* v. *City of Chicago,* 60 id. 121; *Johnson* v. *People,* 83 id. 431.

In the latter case it was said: "The provision of the constitution does not require that the subject of the bill shall be specifically and exactly expressed in the title, hence we conclude that any expression in the title which calls attention to the subject of the bill, although in general terms, is all that is required."

The remaining objection is, that the act of incorporation was not passed in compliance with the provisions of section 21, article 3, of the constitution of 1848, as follows:

"§ 21. Bills may originate in either house, but may be altered, amended or rejected by the other; and on the final passage of all bills the vote shall be by ayes and noes, and be entered on the journal; and no bill shall become a law without the concurrence of a majority of all the members elect in each house."

The non-compliance which is claimed with this constitutional provision is in this respect:—It is claimed that the bill after having passed the Senate, was amended in the House, and that the journal of the Senate does not show that the Senate concurred in the amendment of the House. It is insisted that concurrence of the Senate in the amendment of the House is

the final passage of any bill so amended, and hence that such concurrence should appear by an aye and noe vote entered upon the journal, showing the vote of a constitutional majority in its favor.

Without intimating an opinion as to the correctness of the position taken if the bill had been amended in the House, we think we may rest upon the fact that it does not appear with certainty that the bill was amended by the House.

The bill originated in the Senate. It was read twice in that body, and then amended by the Senate and ordered to be engrossed for a third reading. Some days afterward the bill came up in the Senate and was regularly passed, and sent to the House, asking its concurrence in the passage of the bill. There is no report of the committee, or other entry in the Senate journal, more than such order for engrossment, tending to show that the bill was in fact engrossed before its passage.

In the House, the amended bill as passed by the Senate was read a first and second time and referred to a committee; and afterwards a member of that committee "reported the same back with amendments, and recommended its passage as amended," and it was passed; and the House then "ordered * * * that the clerk inform the Senate thereof," and the clerk of the House reported to the Senate that he was directed to inform the Senate that the House had concurred with them in the passage of the bill "amended as per amendments attached thereto."

Now what amendments were these

May we not fairly presume that they were the very same amendments which the Senate had adopted before its passage of the bill? If the House reported an amended bill to the Senate with the "amendments attached," and not written out in the body of the bill, may there not be ground to think that the Senate did the same thing; and that when it originally passed the bill after having been amended, it simply sent over the original bill, with the amendments attached, to the House; and that when the House committee reported the

Senate bill back "with amendments, and recommended its passage as amended," these amendments were the same amendments which were attached to the bill when sent over from the Senate.

It will be observed the House committee do not recommend that the House adopt the amendments as such, or that the bill be amended by the House, but the recommendation was the passage of the bill "as amended." As amended by whom? The committee had no power to amend a bill. The Senate had made one or more amendments. May not this "as amended" have meant as amended by the Senate?

Again, the House do not order the clerk to ask that the Senate concur in any amendments to the bill, but that he inform the Senate of the passage of the bill, and the clerk reports to the Senate that the House has concurred with the Senate in the passage of the bill amended as per amendments attached thereto. Had these been amendments made by the House, we understand that according to the practice of legislative bodies in such case the House should have asked the concurrence of the Senate in the amendments adopted by the House. The fact that no such request was here made supports the idea that the amendments referred to by the House committee, and by the clerk of the House in his report to the Senate, were in truth but the Senate amendments.

The journals further show affirmatively, that the bill was after this laid before the joint committee of both houses on enrolled bills, and from that committee a report was made to the House that the bill had been duly enrolled, and a report from the same committee was made to the Senate that the bill had been laid before the Governor for his approval.

The law appears signed by the speakers of both houses, and approved by the Governor, and is duly published as a law of the State. The presumptions should all be in its favor as a law duly passed.

The objection taken to it is, that there were amendments made to the bill by the House which were not duly concurred in by

the Senate. The burden is upon the party assailing the validity of the act in this respect, to show its invalidity, and make out a clear case. It is not enough to raise a doubt. We think we may well say, that upon the showing here, it is not clearly and convincingly proved that the amendments in question to the bill, were made to it by the House.

We come to the conclusion, that the judgment of the Criminal Court should be affirmed.

*Judgment affirmed.*

Mr. CHIEF JUSTICE WALKER, dissenting:

I am wholly unable to concur with the majority of the court in its decision of this case. It may, I think, be assumed that the great body of the people understood, when the constitution of 1848 was adopted, that there were various kinds of banks; that the term did not exclusively or generally imply a corporation authorized to issue its bills or notes to circulate as money; that the term embraced corporations and individuals receiving money on deposit, loaning the same, and buying and selling exchange, but issuing no circulation. They must have known that both kinds of banks had existed for centuries, and banks of the latter character existed long before banks of issue were created.

The section of the organic law claimed to be violated is the 5th of article ten, and is this: "No act of the General Assembly authorizing corporations or associations with banking powers, shall go into effect or in any manner be in force unless the same shall be submitted to the people at the general election next succeeding the passage of the same, and be approved by a majority of all the votes cast at such election for and against such law." This language seems to me to be plain, unambiguous, and free from all doubt as to its meaning. The charter under consideration undeniably confers banking powers. It authorizes the body to loan money, buy and sell exchange, discount paper, receive money on deposit, and to issue negotiable paper,—in fact to exercise all the banking

powers incident to corporations created for the purpose, unless they be banks of issue. The language of the section then, beyond all question, if it stood alone, prohibits this charter unless it had been submitted to and had been adopted by a vote of the people as therein required.

That it was intended to prohibit the adoption of such charters as this by the General Assembly is manifest from the language employed in the 4th section. By that, the stockholders in corporations created for banking purposes, issuing bank notes or any kind of paper credits for circulation as money, are made liable for the debts and liabilities of the corporation to the extent of their several shares. Now here, there is made a clear and unmistakable distinction between banks of deposit and loan, and banks of issue, because the liability of shareholders is confined to banks of issue, and by implication excluding shareholders in all other kinds of banks.

The 5th section does not, in terms, provide that such banks as are named in the 4th section are to be alone sanctioned by a vote of the people, but it, in terms, embraces all corporations with banking powers. The language is more comprehensive, and it is apparent to my mind that it was intentionally made so by those who framed the section. It is a well recognized rule of interpretation of such instruments, that the language used must be understood in its general or popular sense unless a different sense is manifest from the context or other portions of the instrument. An examination of the context and every other portion of this article, or in fact the entire constitution, utterly fails, as I think, to show that the term banking powers was used in any but its popular and well understood sense.

The framers of the section, knowing that the term as generally understood embraced all banks and banking institutions of every description, if they intended to exclude from its comprehensive reach any kind of banking corporations, acted most singularly that they, by proviso or otherwise, did not exclude all but banks issuing bills or notes for circulation. If such was their intention they acted strangely in what they did.

14—93 ILL.

When the language employed in such an instrument is vague, indefinite or equivocal in its import, then various means may be resorted to for the purpose of determining the meaning intended to be attached to the language employed. But not so when its meaning is clear and unmistakable. Courts have no right to go outside of plain language to create a doubt that construction may be had. When plainly expressed, courts can only say "thus it is written," and enforce it as the language expresses the requirement. Courts have no power to resort to the circumstances existing when the organic law is adopted, to change the meaning of the language when plainly expressed. We must suppose that those who framed the instrument understood the meaning of the words they used, and that as it was to be read, understood and obeyed by all, they used the words employed in the sense usually attached to them. I think this language is so plain that there is no room for construction, and that it does prohibit, most clearly, the enactment of this charter, and by its provisions the act never became a law, and that no rights were conferred by its enactment.

Nor does the history of such institutions induce me to believe that the framers of the constitution supposed they were of such public benefit that they desired to encourage and foster them to aid in the transaction of the business of the country. On the contrary we may presume they knew that they inflicted loss, distress and great wrong on depositors and those transacting business with them. And I infer it was the intention that until sanctioned by a vote of the people, they should have no place in the polity of our State. Their history has repeated itself in the past few years by the failure of saving banks and incorporated companies all over the Union, resulting in almost the entire loss of the deposits of the unwary who have trusted them with their means. Had they never been created, great suffering and destitution would have been avoided.

As to contemporaneous construction, I understand the rule to be settled and uniformly recognized that it is only admissi-

ble in cases of doubt, but never where the language is plain and unambiguous. Where the language is plain and free from doubt there can be no construction, contemporaneous or otherwise. The provision may be violated, but not construed. In such cases it is the duty of courts to enforce the provision as it is written, and if hardship is produced the fault is not theirs, but of those who framed and the people who adopted it as the fundamental law. I can see that to enforce this section, as I understand it, much hardship and inconvenience may ensue, but the same is generally true of all unconstitutional enactments, and such considerations should not induce the courts to endeavor to avoid such results, unless in cases of doubt, hence the argument of inconvenience, urged by counsel, should not control in this case.

It is urged by counsel, that the provision of the constitution of 1870 has rendered this charter valid, even if it was not so in its inception. I am unable to appreciate any force in the argument. The government of the State was on the point of undergoing a change from one constitution to another, and to remove all possibility of a doubt whether such a change would or might be held to affect legally organized corporate bodies then existing, the provision was inserted. It was to secure and protect them in their legal rights, but not to confer new powers or legalize unconstitutionally or illegally organized corporate bodies. To my apprehension this and no more was the purpose of the adoption of this provision.

I regard the title to the act creating this corporation as wholly insufficient under the constitution; that it is so clearly in violation of the requirements of that instrument that the charter is and should be held void.

The 23d section of article 3 has this provision: " No private or local law which may be passed by the General Assembly shall embrace more than one subject, and that shall be expressed in the title." The title of this law is: "An act to incorporate the International Trust Company." That this is a private or local law is so manifest that it will not be denied.

Then, who would suspect, from the title, that it was an act to incorporate a bank? As well suppose it was to incorporate a body for any one of the hundreds of corporate purposes for which charters are sought and obtained. It seems to me that the mere citation of the constitutional requirement and the title of the act demonstrates its unconstitutionality. If this title complies with the constitution, I am at a loss to know what kind of a title to any description or character of law enacted under it would not be valid. The provision was surely intended to have some operation, but if this be held a compliance with the requirement, it is difficult for me to comprehend where it can become effective.

Again, it is perfectly clear to my mind that the charter never became a law, because the requirements of the constitution were not observed on its passage.

Section 21 of article 3 of the Constitution of 1848 is this: "Bills may originate in either house, but may be altered, amended or rejected by the other; and on the final passage of all bills, the vote shall be by ayes and noes, and shall be entered on the journal; and no bill shall become a law without the concurrence of a majority of all the members elect in each house." This bill originated in and was passed by the Senate, and was then sent to the House, where, after being amended, it was there passed and returned to the Senate as passed with amendments, but no further action on the bill appears by the journal of the Senate to have been taken in that body. The next heard of it is that it was engrossed and signed by the speakers of the two houses and approved by the Governor. The journal of the House does not show in what the amendment consisted. It may be that all was stricken out but the title and the last section, and the bill may have been changed from a milling or some other corporation to the provisions it now contains. Or the change may have been slight. But I think no one has any basis, from the journals or the law as we find it, to conjecture that the amendment was the one or the other.

Now, this provision is to my mind so plain, that a bill that does not receive the assent of a majority of the members elect of both houses on a vote by ayes and noes, in the shape that it receives the approval of the Governor, must be void. See *The People* v. *Reitz,* 62 Ill. 253.

In that case the bill originated in and passed one house, and was amended in the other, and being returned to the house in which it originated, that house refused to concur, and the bill was returned to the house which made the amendment, and on a motion to recede, the motion was adopted by a majority of a quorum, but not by a majority of the members elect, and it was held that the bill was not finally passed by the constitutional majority, and that it was void. In that case we see that it was held that a majority of all the members elect was essential to strike out the amendment. Or that receding from the amendment was a final passage of the bill. If, then, the receding from an amendment is, under such circumstances, a final passage of the bill, why is not the adoption of an amendment by the other house a final passage of the bill as amended ? If it required a majority of all the members of the House to recede from its amendment, how can the distinction be justly taken which should not require an amendment adopted by the other house to be passed in the same mode?

Again, the bill was reported back to the House by its committee, and they recommended that it should pass as amended. It is clear to my mind that the bill as it came from the Senate was amended by the House committee, and the report to the Senate that the House had passed the bill with the amendments renders it clear that the House did amend the bill. How could the House committee know the bill had been amended by the Senate before it was passed by that body, as the journals were not before them? It, I think, is clear the House amended this bill, and if so, it should have been then passed by the Senate by ayes and noes to have been finally passed as required by the constitution.

The bill was not finally passed by the Senate before it was sent to the House. Nor was it finally passed by the House with the amendments. Nor does the journal of the Senate show that it ever passed that body with the amendments of the House, either by ayes and noes or otherwise.

It is true that when we find a bill signed by both speakers and approved by the Governor the presumption is raised that the bill has been constitutionally adopted. But we have held in many cases that this presumption may be rebutted by the journals of the two houses. If they fail to show that the bill was passed by a majority of the members elect in each house, and that the ayes and noes were not entered on the journals of the two houses on its final passage, then the presumption is overcome, and the supposed law is held to be void because the evidence of the constitutional passage of the law is wanting.

As I understand, the practice of the two houses, since the adoption of this provision, has been, when an amendment is made to a bill in the house in which it did not originate, on its return to the house in which it did originate it is put on its final passage, and the ayes and noes are entered on the journals. That not having been done in this case, all presumption that it was finally passed by both houses, by a majority of the members elect to each, and the ayes and noes were entered on the journals, is overcome.

Nor do the journals show that the Senate in any manner concurred in the House amendment, either by the ayes and noes or in any other manner, and hence we have nothing appearing from which it can be inferred that the law was ever passed, and I think the requirement of the constitution has been wholly disregarded.

We have held in the cases of *Spangler* v. *Jacoby*, 14 Ill. 297, *The People* v. *Starne*, 35 id. 121, *Wabash Railroad* v. *Hughes*, 38 id. 174, and a number of other cases, that the journals must show a concurrence of a majority of the members elect to each house, on the final passage of a bill, or the

act will have no force, and the ayes and noes is the only test of the passage of a bill, and they must be entered on the journals; that when a bill has become a law there is record evidence of every material requirement, from the introduction of the bill until it becomes a law, and this evidence is found in the journals. I believe that this bill never became a law, and should be held invalid, and that no rights have been acquired under it.