McIlvaine, C. J.
The main question in this ease relates to the constitutionality of the act of Feb. 26, 1873, entitled, “ An act to incorporate savings and loan associations,” under which defendant in error was incorporated and assumed to exercise “ banking powers,” exclusive of the power to make and issue bills and notes to circulate as money. This enactment was duly passed by the general assembly, but was not submitted to the people at the succeeding general election for their approval.
Section 7, article 13, of the constitution reads as follows: “No act of the general assembly, authorizing associations with banking powers, shall take effect until it shall be submitted to the people, at the general election next succeeding the passage thereof, and be approved by a majority of all the electors voting at such election.”
The statute in question does not assume to authorize the making and issuing of bills or notes to circulate as money, and the question is now submitted for our determination whether it is within the meaning of the provision of the constitution above quoted.
That the statute authorizes the exercise of other powers, to wit, the receiving of deposits, loaning of money, &e., usually exercised by banking associations, is not disputed ; and that the terms of the constitutional provision, “ associations with banking powers,” are broad enough to include the powe2's usually enjoyed by banking associations, is too plain to be doubted. It is not denied, and cannot be, that at the date of *619 the adoption of the constitution, and for a long time prior thereto, the commercial world was familiar with banks of deposit and of discount, as well as banks of issue, of which the last named only made and issued bills and notes to circulate as money; nevertheless the powers exercised by either class of banks, were properly denominated “ banking powers ” by the commercial world.
At the same time it is equally certain that the phrase “ banking powers ” was susceptible of another and restricted meaning, which related only to the powers employed in the making and issuing of paper money, or at most, to powers exercised by associations organized to deal in money, including the making and issuing of bills and notes to circulate as money.
When the use of this phrase, in its restricted meaning, was first introduced, we cannot say, but as early as 1815, the general assembly of this state passed an act, providing, among other things, that it should not be lawful for any individual or company of individuals to issue and put in circulation any note or order for the payment of money and calculated to circulate as a bank-bill or note, unless such individual shall be specially authorized by law to do so; or unless such company of individuals shall be by law “ incorporated for that purpose.” 2 Chase, p. 865, § 5. In the following year, January 27, 1816, an act was passed defining banking in this state (2 Chase, 904), the second section of which reads as follows : “ That every company or association that shall lend money, and shall issue by their officer or officers, or by any person or persons, bonds, notes or bills payable to bearer or payable to order, and indorsed in blank, or use other shift or device whereby the bonds, notes or bills given by such company or association, or on their behalf, pass or circulate by delivery, shall be taken and deemed a bank within this act.” The fourth section of this act prohibited the making and issuing of bills or notes to circulate as money, unless authorized by statute. In speaking of this statute, Judge Hitchcock, in State v. Granville Alexandrian Society, 11 Ohio Reports, 1, says, “This act prohibits the exercise of banking powers except by banks incorporated by the law of the state.”
*620 Whatever may have been the rights ■ at common law of natural persons, it is quite clear that by this legislation the state assumed, as a prerogative right, the control of the business of making and issuing bills and notes to circulate as money, and denominated such business banking. And though the state could not engage in the business by reason of the provision of the constitution of the United States, which prohibited states, as such, from emitting bills of credit, it thus assumed the exclusive right, in this state, of granting the franchise to make paper money to others.
It must be observed, however, that while these restrictions were placed on the making and issuing of bills and notes to circulate as money, the right to receive deposits, discount paper and deal in exchange was not restricted, but was left free to all. The result was that individuals of every class, especially merchants and farmers, having the confidence of the people, received money on deposit and loaned the same at interest, in connection with other business, without being denominated or known as bankers. Other persons, either as individuals or associations, engaged exclusively in dealing in money, and in any mode required by the commerce and trade of the country, except only the making and issuing of bills and notes to circulate as money, without any license or authority from the government. Such dealers in money were denominated and known as brokers or private bankers, but were always designated by some name, which distinguished their business from that involving the power to make or issue bills and notes to circulate as money.
The policy of the state thus inaugurated in 1815 and 1816, as well as the practice of the people under it, was continued for more than a generation, and until the constitution of 1851 was submitted to the people of the state for adoption. Hence, it seems evident, from what has been said, that the phrase, “ banking powers,” may have been used at the adoption of the constitution, in the restricted sense above stated, with propriety, and without violence to the words.
, The sense or understanding of the people upon this subject, before the adoption of the constitution is brought to our *621 attention in a very forcible manner. True, the witnesses have not been examined orally before us, but the testimony, for that reason, is not entitled to less weight. In the case of the Bank of the U. S. v. William D. Primrose, in the Supreme Court of the United States in 1839, where the meaning of the word bank was involved, Daniel Webster, in his argument, as published in volume 6 of his works, p. 106, after great consideration, said, “ What constitutes banking must be something peculiar. There are various acts of legislation by different states in this country, for granting or preventing the exercise of banking privileges. But has any law ever been passed to authorize or to prevent the buying by an individual of a bill of exchange ? No one has ever heard of such a thing. The laws to restrain banking have all been directed to one end ; that is, to repress the unauthorized eirculation of paper money. There are various other functions performed by banks; but, in discharging all these, they only do what unincorporated individuals do.
What is that, then, without which any institution is not a bank, and with which it is a bank? It is a power to.issue promissory notes with a view to their circulation as money.”
Further on in his argument he says, “ When our state / legislatures have undertaken to restrain banking, the great end in view has been to prevent the circulation of notes. I may on this point refer to the statute books of Massachusetts, Maine, Rhode Island and New Hampshire, for restraining unauthorized companies from issuing notes of circulation. Not unlike is the statute of Ohio, imposing a punishment for unauthorized banking. Her law defines, in the first place, what constitutes a bank, namely, the issuing of notes which pass by delivery, and which are intended for circulation as cash. That .is the true definition of a bank, as we understand it in this eountryP
In an opinion contained in the Supplement to 9 Cushing, 608, Chief Justice Shaw gave substantially the same meaning to banking as that expressed by Mr. Webster. He said : “ It is not only the right, but the duty of the legislature, to make all such reasonable and wholesome laws, in regard to all the *622 various branches of business and pursuits in the community, as may be necessary for the safety and welfare of the body politic. It is upon this principle that the legislature has prohibited altogether what has been called private banking, by subjecting every person to a penalty, who shall issue or pass any note, bill,'order or check, with intent that the same shall be circulated as currency, except such as are particularly specified in the act.”
In the case of Bank of Senora County v. Fairbanks, 57 Cal. 196, it was held :
“Br the Coujkt: Under article 4, section 34, of the constitution of the State, deposit and loaning associations may be formed which do not issue paper to circulate as money; and such associations are not banks within the prohibition of the constitution, although they may be called banks.”
The constitutional prohibition thus construed, reads as follows : “ § 34. The legislature shall have no power to pass any act granting any charter for banking purposes ; but associations may be formed under general laws for the deposit of gold and silver; but no such association shall make, issue, or put in circulation, any bill, check, ticket, certificate, promissory note, or other paper, or the paper of any bank, to circulate as money.”
C. J. Taney, in the case of the O. L. I. & T. Co. v. Debolt, 16 How. 438, said: “In the legislation of Ohio, the words ‘ banking institutions,’ or ‘ banks,’ appear always to be confined to corporations which were authorized to issue bills or notes for circulation as currency.” And Chief Justice Bartley, in Exchange Bank of Columbus v. Hines, 3 Ohio St. 1, said, p. 31: “ By a long course of legislation in this state, the business of banking has acquired a restricted legal signification applying only to those banks which exercise the functions of issuing paper money.” So Chief Justice Wood, in Corwin v. U. & C. M. I. Co., 14 Ohio, 6, said: “ Although receiving deposits is a part of the business of banks, it is no exclusive privilege of theirs, nor is the discounting of notes.” And in that case, the court determined, that “ it is no violation of a charter, which contains a clause prohibiting the exercise of banking powers, to receive money on deposit.”
*623 The views thus expressed by eminent lawyers and judges, in connection with the course of legislation in this state, for many years before this clause in the constitution was adopted, renders it quite probable that the phrase “ banking powers,” was understood by the people adopting it, in its restricted sense, as applying only to powers exercised by banks of issue. This probability is strengthened by a review of the circumstances under which the 7th section of the 13 article was inserted in the constitution, by the convention which prepared it. The convention prepared its work with open doors, and its progress was scrutinized by the people, who were much interested in the result. Indeed, much interest was manifested by the people of the state in the selection of delegates to the convention, as two subjects of especial concern, to wit, corporations and currency, were expected to come before the convention for its consideration. A strong feeling existed against paper money and corporate privileges.
When the' convention met, a committee on “banks and currency,” was appointed,-another on “corporations.” The last named committee secured the adoption by the convention of the first six sections of article 13, on corporations. The first named committee did not secure from the convention the adoption of any portion of its work. This committee, however, was not idle. Its members were divided on the question of currency. The issne was between a metallic currency —gold and silver — on one side, and a mixed currency — metallic and paper — on the other. There was no controversy as to banks, save only on the question whether the issue of paper currency should be prohibited. The result was two reports from the committee, a majority and minority report. That of the majority recommended a provision disabling the general assembly to create or incorporate any “ bank or banking institutions whatever,” or to authorize any “ paper medium intended or calculated to circulate as money or currency.” In respect to what is now called other branches of the banking business, it was provided that: “ The business of loaning and dealing in money shall be left free to all, subject to such restrictions as may be provided by law.”
*624 The minority report recommended leaving the whole matter to the discretion of the general assembly. ■ 1 Convention Debates, 708-9.
During the debate on these reports, it was truly said by Mr. Henderson, a member of the convention, in speaking for the party which was most urgent for restrictive measures, “ They have, as I understand, no objection to banks of discount, of deposit or of exchange. It is solely against the issue feat/m'e that they contend. They look upon that function which empowers banks to issue their own notes to circulate as money, as the nuisance which they desire should be abated.”
Substitutes for the reports were also offered in the convention, but no restriction was suggested upon banks or banking-except upon banks of issue. Neither of these reports or propositions received favorable action from the convention ; but as a compromise measure, within four days of-the final adjournment, another section, -to wit; the 7th (above quoted) was added to the article on corporations by a small majority vote of the convention.
There .can be no doubt that the convention intended to limit this provision to banks of issue, and it is reasonable to suppose that the people to whom the constitution was submitted for final adoption and who were fully advised as to the .struggle in the convention on the subject, understood this section in the same way.
It has been held by the supreme courts' of Illinois and Kansas, that similar provisions in the constitutions of those states relate only to banks of issue. Our constitution, in this respect, was substantially a copy from that of Illinois, and that of Kansas from our own. True, in both of these there are other provisions in the constitution which' aided in the construction given to “banking powers;” but, nevertheless, the reasoning of the court, and the conclusions arrived at, are very persuasive in the case before us. People ex rel. Badger v. Loewenthal et al., 93 Ill. 191; Bank v. Pape, 20 Kansas, 440.
In affirming the constitutionality of this statute, we have not felt the necessity of resorting to the well established rule *625 in the deciding on the constitutionality of statutes, to wit: that unless the conflict between the statute and the constitution be manifest, the validity of the statute must be declared, yet we have no hesitation in saying that by applying this rule, the result would be the same as we have above indicated.

Judgment affirmed.