JAMES W. SYKES

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa January 25, 1889.*

1.  FRAUDULENT WAREHOUSE RECEIPTS—*statutes—title of act relating to penalty.* Section 25 of "An act to regulate public warehouses, and the warehousing and inspection of grain," and to give effect to article 13 of the constitution of this State in the imposition of a penalty or punishment, is not void merely because the particular matter of that section is not embraced in the title of the act. The section is germane to the purposes of the act as stated in its title.

2.  SAME—*sections 124 and 125 of the Criminal Code—whether repealing section 25 of the Warehouse act.* Section 25 of the act regulating public warehouses, which denounces the punishment of warehousemen for the issue of fraudulent warehouse receipts, is not repealed by sections 124 and 125 of the Criminal Code. They are not so repugnant as to work a repeal by implication.

3.  Section 25 of the Warehouse act is directed against the issue of fraudulent receipts by public warehouses and warehousemen, and because of the public capacity in which they act, while sections 124 and 125 of the Criminal Code are directed against every person who shall "fraudulently make or utter any receipt or other written evidence of the delivery or deposit of any grain," etc., upon any wharf or place of storage, or in any warehouse, mill, store or other building, and includes places of storage which are not public warehouses. In the first case, the offense consists solely in issuing the receipts, from which a fraudulent result may occur to another; while in the last, it is made to consist in the making or uttering of the receipt for a fraudulent purpose or with a fraudulent intent.

4.  SAME—*what will constitute a false and fraudulent receipt—character of the intent.* If a public warehouseman issues warehouse receipts for a particular kind of grain or seed, and pledges the same as collateral security for a loan, when, in fact, he has no such grain or seed in store, and no such grain or seed has been deposited by the person to whom the receipts are issued, such receipts will be false and fraudulent, and the warehouseman issuing the same will be liable to indictment and punishment, even though he may have had a large quantity of the specified grain or seed at his place of business as a dealer in the article, but which is disconnected with his warehouse.

5.  Warehouse receipts being assignable by indorsement, so as to transfer the property they represent, the issue of a false receipt for grain not in store, although issued to a party having knowledge of its being false, is a violation of the statute.  By the issue of such receipt the holder is furnished with the means of perpetrating a fraud on the public.  The intent with which such receipt is issued is immaterial.  The intent necessary to constitute this offense relates alone to the intent to issue the receipt knowing it to be false.

6.  Where a public warehouseman issues to another, as collateral security for a loan, warehouse receipts of grain, knowing that the grain therein purporting to be represented is not, in fact, in store, as therein designated and described, the crime created by section 25 of the Warehouse act is committed; and it will be immaterial whether the defendant intended a fraud on the person to whom issued, or other persons. And the fact that the person to whom the receipts were issued may have known there was no grain in store called for by the receipt, or may have consented to the removal of the grain, if deposited, without surrendering or canceling the receipts therefor, will not exonerate the warehouseman from criminal liability.

7.  SAME—*evidence—as affecting degree of punishment.*  The punishment of a public warehouseman for the issuing of false or fraudulent receipts of grain being fixed at not less than one nor more than ten years' confinement in the penitentiary, the circumstances under which the act was done, and the motives actuating the defendant, may be shown in mitigation of his punishment.  Such evidence may be controlled by instructions, as in other cases where evidence is competent and admissible for a particular purpose.

8.  CHARGING THE JURY—*limiting to the actual matters on trial.*  Where a defendant is tried only on part of the counts of an indictment, the better practice in instructing the jury is to direct their attention to the charge in the counts under which the trial is had.  But when the attention of the jury is directed only to the facts constituting the offense as charged in the counts to which the prosecution is limited, there will · be no prejudicial error in omitting to particularize the counts, of which defendant can complain.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. OLIVER H. HORTON, Judge, presiding.

The plaintiff in error was indicted under the 25th section of the Warehouse act.  (Starr & Curtis, chap. 114, p. 1975.) The evidence for the People tended to prove that for two or three years prior to October, 1886, the defendant was carrying

on business in Chicago, Illinois, as a warehouseman of a public warehouse of class "C." About the last of February, 1885, he opened an account with the Merchants' Loan and Trust Company, a corporation doing a banking business. About the time of opening his account, Sykes applied to the officers of the company for accommodations in the way of loans, and an arrangement was made, by which the bank was to advance him money, from time to time, upon his notes, which were to be secured by warehouse receipts, issued by him to the bank, upon and for timothy seed belonging to Sykes, in store in his warehouse, and that he would keep the same insured for the benefit of the bank. Early in March, 1885, a loan was made of $7000, which was evidenced by his note, with which was deposited, as collateral security, two warehouse receipts, which are set out in the record, dated March 14, 1885, and numbered, respectively, 20,035 and 20,036. The receipt 20,035 is as follows:

"*Warehouse receipt No. 2035, J. W. Sykes & Co.'s Public Warehouse of Class 'C,' for the storage of Grass Seeds, 98 and 100 Michigan Ave.*

"CHICAGO, ILL., *March 14, 1885.*

Received from Merchants' Loan and Trust Co., in apparent good order, into our store as above, eleven hundred bags of timothy seed, marked thus : 600 bags 'An,' and 500 bags "Ap,' deliverable to the order hereon of Merchants' Loan and Trust Co., surrender of this receipt and payment of storage, loss or damage by the elements, heat, leakage, shrinkage, ratage, fire, etc., at owner's risk. Storage paid for six months.

"Rates of storage, two cents per bag for first month, and two cents per bag each following month or fraction thereof.

J. W. SYKES & Co."

The other receipts vary from this only in date, the amount of produce stored, and the marks and designations of the property.

The bank made no deposit of seed with Sykes at any time. In May, the note for which these two receipts were held as collateral, was paid, and the receipts returned to Sykes. May 29, Sykes withdrew some warehouse receipts which he had given as collateral to another note to the bank for $7500, and deposited these two receipts in their stead. The note of Sykes for $7500 was renewed from time to time, as it matured, and these receipts remained with the bank as collateral to such renewal notes.

On the 26th of August, Sykes borrowed from the bank $8000, gave his note therefor, and deposited as collateral security thereto his warehouse receipt No. 2048, dated that day, for 2200 bags of timothy seed, received from the Merchants' Loan and Trust Company, marked thus: 1000 bags marked 32, 800 bags marked 33, and 400 bags marked 34. On December 31, 1885, the $8000 note became due, and on that day Sykes made his note for $15,500, delivered it to the bank, and placed the three warehouse receipts before mentioned as collateral security to this note, the proceeds of which last note paid the two notes before mentioned. Subsequently, the note of $15,500 was renewed, Sykes again placing the three receipts as collateral to the renewal note. This last note has never been paid.

On the 1st day of October, 1886, Sykes made an assignment for the benefit of his creditors. Neither at the time of issuing said three receipts, or either of them, did Sykes have any seed in his store in bags marked as stated in these receipts, or either of them.

The evidence on behalf of the defendant tended to prove that Sykes' main business for the thirty-nine months he was in business at 98 and 100 Michigan avenue, and next preceding his failure, was that of a seed merchant, and during that time his sales of seed amounted to $1,335,900; that his warehouse business was incidental to his business as a merchant, and mainly grew out of sales of seed made by him which the

purchasers left on store with him, being one hundred and two lots, of the aggregate value of about $146,000, for which he gave them receipts, and they paid him a compensation, but that he did receive seed from others into store there, to the number of forty-four lots, of an aggregate value of about $38,000; that at the time of issuing the receipts 2035, 2036 and 2048, or at any time after, he did not have belonging to him, or any one, in his store, any timothy seed in bags which were marked as stated in any of the three receipts; that the Merchants' Loan and Trust Company did not, before or on the day of the date of any receipt, or after, or ever, deliver to him or into his store any timothy seed whatever, and that he never received any from it in storage.

On the trial, the defendant sought to prove conversations between the officers of the bank and himself, in respect of opening said account with the bank, the accommodation Sykes would require, and the security to be given by Sykes, and that it was understood that Sykes should give his notes for the money he might borrow, to be secured by warehouse receipts upon his own property, which, however, was to remain and be subject to his own use in the conduct of his business,—that is, the timothy seed was not to be tied up thereby, but that he should have a right to sell the same, and that it was understood that such warehouse receipts were issued and accepted by the bank as mere formal and nominal security for said sums so advanced. Upon inquiry by the court, the prosecution avowed that they were proceeding on the counts in the indictment drawn under the Warehouse act. The court, thereupon, determining that the ninth, tenth, twelfth and thirteenth counts of the indictment were the counts under the Warehouse act, excluded from the jury all the evidence tending to show the intent with which the alleged warehouse receipts were issued by the defendant, holding, in effect, that evidence tending to show the want of fraudulent intent in their issue, was incompetent. Defendant also offered to show that at the dates,

respectively, of said receipts, and at all times thereafter, and until October 31, 1886, defendant had in his store, 98 and 100 Michigan avenue, more than 4500 bags of timothy seed, belonging to himself, and for which he had issued no warehouse receipts.    Objection thereto was sustained by the court.

The ninth count of the indictment is against the defendant as a warehouseman of a public warehouse of class "C," and is for fraudulently issuing warehouse receipts for grain not in store or on hand at the date thereof.    The tenth count is for fraudulently issuing warehouse receipts, by the defendant, as such warehouseman, for seed not actually in store.    The twelfth count is for fraudulently issuing warehouse receipts, fraudulent in character, as to the quantity, etc., of grain in store; and the thirteenth count is for issuing warehouse receipts, etc., and afterwards willfully and fraudulently removing the produce therein described from such public warehouse, without the return, surrender and cancellation of such receipts, etc.

The trial resulted in a verdict of guilty.    Motions for new trial and in arrest of judgment were severally overruled, and sentence pronounced upon the verdict.

Mr. J. A. SLEEPER, for the plaintiff in error:

Section 25 of the Warehouse act, and the offense therein named, are not within the subject expressed in the title of the act.

Warehousing does not embrace a transaction whereby one party loans money to the other, and takes a pledge of property, having the effect of a lien or mortgage.    Such transactions are regulated by the act in relation to mortgages.    Then the loan by the bank to Sykes, and the securing its payment by Sykes by his note, and depositing his receipts as collateral security, were not the subject of a warehousing transaction. It was not the issuing of a warehouse receipt, within the purview of the title to the Warehouse act.    *State* v. *Bryant,* 63 Md. 66; *Morris* v. *Kidder,* 34 Hun, 534; *Yeni* v. *McNamee,*

45 N. Y. 614; *Nelson* v. *Brown,* 53 Iowa, 555; *Sexton* v. *Graham,* id. 181; *Dean* v. *Driggs,* 44 Hun, 480; *Ferguson* v. *Nat. Bank,* 14 Bush, 555; *Fishback* v. *Van Dusen,* 33 Minn. 111; *Bank* v. *Hibbard,* 48 Mich. 118.

The section of the statute being highly penal, must be construed strictly. *Reinecke* v. *People,* 15 Bradw. 241; *Jones* v. *People,* 110 Ill. 590; *Waddle* v. *Duncan,* 63 id. 223; *Edwards* v. *Hill,* 11 id. 22; *People* v. *Peacock,* 98 id. 172; *Perry County* v. *Jefferson County,* 94 id. 214; *Walker* v. *Springfield,* id. 364; *People* v. *Thatcher,* 95 id. 109; *Hamilton* v. *State,* 102 id. 367.

The rulings of the court that intent did not enter into the commission of the crime denounced by section 25 of the Warehouse act, were erroneous. Hurd's Stat. chap. 38, sec. 280.

The cases under the Dram-shop act, so called, notably *Wright* v. *People,* 101 Ill. 126, are not in point. No person has a right to sell liquor at all without a license. His license does not give him the right to sell to everybody. Selling liquor is an unlawful business, and a person can only justify himself so far as he has a license. He must see to it that he does not transcend his license. He must know, when a person asks for liquor, that he is licensed to sell to him. It is just the same as if he should sell liquor without any license. *Streeter* v. *People,* 69 Ill. 595; *McCutheon* v. *People,* id. 601; *Eells* v. *People,* 4 Scam. 501; *Chambers* v. *People,* id. 351.

If the parties agreed that the receipts should not be deemed a conveyance or pledge of Sykes' property at all, there would not exist the intent to violate a public law. It must be that the parties could agree upon the character of the securities to be given for money loaned, and their agreement that receipts to be given were to represent nothing, and were not to take Sykes' seed out of his stock and convert it into warehouse seed, would fix the transaction as not within the Warehouse act.

The ruling of the court that the conversations between Sykes and Orson Smith, which constituted the agreement between Sykes and the company, under which he opened his

account there, and borrowed money from time to time, were not competent evidence, was erroneous.

Mr. GEORGE HUNT, Attorney General, Mr. JOEL M. LONGE-NECKER, State's Attorney, and Mr. GEORGE N. STONE, for the People:

It is insisted by the plaintiff in error, that as Sykes had issued a promissory note, and issued these receipts and deposited them with the bank as collateral security therefor, therefore he is not guilty under the Warehouse act, though the receipt be a fraudulent receipt, and issued in violation of the Warehouse act, and that the receipt is to be treated as a pledge, and not as a warehouse transaction.

In answer to this position, we contend that the moment Sykes delivered these receipts to the bank they then became warehouse receipts, and were negotiable, as provided by the statute, and liable to pass into different hands,—not as a pledge, but as warehouse receipts; and, in fact, receipts were introduced in evidence in this case which had been transferred and negotiated for other seed stored in Sykes' warehouse, showing, conclusively, that the plaintiff in error intended that they should be considered as warehouse receipts, and not as a pledge, or in the nature of a chattel mortgage given on his own property. Sykes had a right, as a public warehouseman, to issue the class of receipts that he did issue. That being true, then when he issued these receipts, purporting to be genuine warehouse receipts, we contend that he is certainly liable to prosecution under the Warehouse act; and for authority on this point we cite *State* v. *Morse*, 52 Iowa, 509.

The section of the Warehouse act under which Sykes was convicted, was enacted to protect the community. It became necessary for the legislature to protect the community against fraudulent receipts, and for that reason the statute was passed to protect third persons who might purchase the receipt, or to whom it was issued. *State* v. *Stevenson*, 52 Iowa, 701.

It matters not in what capacity the bank held the receipts, so long as they show on their face that they are genuine warehouse receipts. *Cochran* v. *Ripley*, 13 Bush, 495.

A warehouseman having property of his own stored, may part with his title to it by execution and delivery of an ordinary warehouse receipt. *Bank* v. *Wellington*, 48 Mich. 118; *Cochran* v. *Ripley*, 13 Bush, 465; *Foster* v. *Chicago Dock Co.* 48 Ill. 507; *Sexton* v. *Graham*, 53 Iowa, 181; *Gibson* v. *Bank*, 11 Ohio St. 311.

It is urged, on the question of intent, that Sykes should have been permitted to state all the circumstances connected with his issuing of these receipts, and other matters going to show the intent on this point. We call attention to the warehouse section, in which it says, "any public warehouseman of any public warehouse, who shall, etc., * * * shall be deemed to have committed a crime,"—so that intent does not enter into the act of issuing the receipt for grain not in store, or for removing grain after having issued receipts therefor. It is itself a crime, according to the statute; and on this point we cite the following: *State* v. *Morse*, 52 Iowa, 509; *Gardner* v. *People*, 62 N. Y. 299; *McCutcheon* v. *People*, 69 Ill. 601; *Halsted* v. *State*, 12 Vroom, 552.

Section 25 of the Warehouse act is germane to the primary object of the act, and is not in conflict with the constitution, declaring that no act passed shall embrace more than one subject, etc. *O'Leary* v. *Cook County*, 28 Ill. 534; *Magner* v. *People*, 97 id. 320; *People* v. *Lœwenthal*, 93 id. 191.

Mr. Justice Shope delivered the opinion of the Court:

Upon the trial of this cause, it was avowed by the People that the prosecution was upon the counts under the Warehouse act, which, the court determined, limited the charge to the ninth, tenth, twelfth and thirteenth counts of the indictment, and the trial proceeded under those counts.

It is contended that the court erred in giving the second and third instructions on behalf of the People, for the reason the jury were thereby told that if they believed, from the evidence, etc., certain things, "as charged in the indictment," etc., they should find the defendant guilty, instead of limiting the jury to the consideration of the facts charged as constituting the offense in the particular counts under which the defendant was on trial. The better practice in such cases is to direct the attention of the jury to the charge in the counts upon which the prosecution rely. But there was here no prejudicial error. In each of the instructions complained of, the attention of the jury was directed only to the facts constituting the offense as, charged in the counts to which the prosecution was limited.

The statute before referred to, and upon which said counts were predicated, is the 25th section of the act of 1871, (Starr & Curtis, par. 180, page 1975,) which is as follows: "Any warehouseman of any public warehouse who shall be guilty of issuing any warehouse receipt for any property not actually in store at the time of issuing such receipt, or who shall be guilty of issuing any warehouse receipt in any respect fraudulent in its character, either as to its date, or the quantity, quality or inspected grade of such property, or who shall remove any property from store (except to preserve it from fire or other sudden danger) without the return and cancellation of any and all outstanding receipts that may have been issued to represent such property, shall, when convicted thereof, be deemed guilty of a crime, and shall suffer, in addition to any other penalties prescribed by this act, imprisonment in the penitentiary for not less than one and not more than ten years."

It is urged that this section of the statute is void, because the provision imposing a penalty for issuing such warehouse receipts, etc., is not embraced in the title of the act. The act is entitled "An act to regulate public warehouses and the warehousing and inspection of grain, and to give effect to article 13 of the constitution of this State." Section 6 of the article

referred to provides: "It shall be the duty of the General Assembly to pass all necessary laws to prevent the issue of false and fraudulent warehouse receipts, and to give full effect to this article of the constitution," etc. It is, we think, manifest from the mere statement, that the section under consideration is germane to the purposes of the act as stated in its title, and not, therefore, obnoxious to the objection. *People* v. *Lœwenthal,* 93 Ill: 191; *Magner* v. *People,* 97 id. 320.

It is next insisted that this section of the Warehouse act was repealed by the passage of sections 124 and 125 of the Criminal Code. The position is not well taken. The Warehouse act and the Criminal Code, severally containing the sections referred to, were parts of the general revision of 1874, and the presumption is, the legislature intended the revision should be a consistent body of laws, and each part thereof be capable of enforcement. The provisions of these sections are not repugnant, and there is, therefore, no repeal by implication. The section of the Warehouse act is directed against the issuance of warehouse receipts, etc., by warehousemen of public warehouses, as designated in and regulated by that act, and because of the public capacity in which they are acting, and that warehouse receipts for property stored in such public warehouses are, by the 24th section of the act, made transferable by indorsement, and thereby a valid transfer of the property represented by such receipt is made, the offense is made to consist simply in committing or doing the acts prohibited. On the other hand, the sections of the Criminal Code referred to are directed against every person who shall "fraudulently make or utter any receipt or other written evidence of the delivery or deposit of any grain" or other commodity upon any wharf or place of storage, or in any warehouse, mill, store or other building, and includes places of deposit or of storage not public warehouses, as designated in the Warehouse act. In the one case the offense consists solely in issuing the receipt, from which a fraudulent result may occur prejudicial to the

public or those into whose hands the receipt may come; while in the other it is made to consist in the making or uttering of the receipt for a fraudulent purpose or with a fraudulent intent. It is apparent, we think, that the objects sought to be attained by these enactments are distinct, and that full effect could not be given to the legislative intent in respect of the acts of public warehousemen under the sections of the Criminal Code alone.

The principal point of contention, however, is, that the court erred in excluding from the jury, as it practically did, evidence tending to show the intent with which the several warehouse receipts were issued by the defendant, and ruling that it was immaterial whether such receipts were issued by the defendant for a fraudulent purpose or with a fraudulent intent, or not. As will be observed, we have to some extent anticipated this contention. The defendant was a warehouseman of a public warehouse of class "C." He so testifies, and the evidence clearly establishes that his warehouse fell within that class, as fixed by the second section of the Warehouse act. It can make no difference that the defendant was a dealer, also, in the commodities for the storing of which he kept such public warehouse. His transactions as warehouseman could not be affected thereby. The receipts issued by the defendant to the bank, purport, on their face, to be issued by the defendant as warehouseman of a public warehouse of class "C," and are issued in compliance with the requirements of the 24th section of the act. Therein is designated the brand or distinguishing marks of the property purporting to have been delivered for storage by the bank, as is provided shall be done in receipts for property stored in public warehouses of that class. It is obvious, therefore, without further discussion, that the defendant was a warehouseman of a public warehouse, and issued the warehouse receipts charged in the counts of the indictment before referred to, and subject to all the regulations prescribed by the Warehouse act for his conduct as such warehouseman. These several receipts were thus issued by him, when, in fact,

as he himself testifies, the particular property designated and described in such receipts was not in store with him at the time of the issuance of such receipts, or at any other time. It is conceded that no timothy seed, in bags bearing the marks and brands stated on the face of the receipts to have been deposited for storage by the bank, was ever, at any time, on deposit or in store in the defendant's warehouse, or under his control. The bank at no time made any deposit or stored any timothy seed therein. The receipts were, therefore, false in every particular relating to the property thereby represented to be in store. If, therefore, the court was correct in its ruling, the defendant was clearly punishable under the statute referred to.

To understand this contention clearly, some reference to the facts is necessary. The defendant applied to the Merchants' Loan and Trust Company for financial accommodation. The proof tends to show that he indicated to the bank the sums required might aggregate $100,000, and proposed to issue warehouse receipts upon his own produce in store, as collateral security for advances made by the bank, and keep the property represented by such receipts insured for the benefit of the bank; and the proof also tends to show that he procured insurance upon property purporting to be represented by such receipts. An account was opened, advances made by the bank, for which the note of the defendant was given, to which the warehouse receipts introduced in evidence, and others, were collateral, to a large amount, aggregating, at the time of the failure of the defendant, and remaining unpaid, over $90,000.

The evidence offered by the defendant, and practically excluded, tended to show that it was understood that the produce of the defendant represented in the receipts should not be tied up thereby,—that the warehouse receipts were intended and understood to be mere formal security for advances made by the bank. And it is contended, that as the officers of the bank knew no deposit had been made of grass seed, as shown on

9—127 ILL.

the face of the receipts, or otherwise, by the bank, it was competent for the defendant to prove the understanding with which the bank received such receipts, as tending to rebut the presumption of fraud or fraudulent intent on the part of the defendant in issuing the same.

If the statute in question was intended for the protection of the person to whom the receipts issued, only, there would be much force in the position, for if the bank made no deposit, it could not be deceived by the statement in the receipts that it had stored the property therein described, and if the property of the defendant actually in store was not to be represented in such receipts, and this was so understood, no fraud could have been perpetrated upon the bank. This statute, however, has a much broader scope, and is not designed alone for the protection of the person to whom the receipt is in the first instance issued; it is intended not only for his protection, but to protect the public at large, and all persons into whose hands the receipt may come in the course of business. By the provisions of the 24th section of the act, these receipts of public warehousemen are made transferable by indorsement of the party to whom they are issued, and thereby a valid transfer of the property represented in such receipts is made; and it is provided that such indorsement may be made either in blank or to the order of another. Such receipts, therefore, pass from hand to hand by indorsement of the person to whom issued. It can not be doubted that commercial transactions are greatly facilitated by this transfer of property, and the purpose of the act was to protect the holders of such public warehouse receipts from imposition and fraud. The receipts are required to be the true representative of property actually in store in the warehouse, and their issuance is prohibited under any other conditions or circumstances. If the bank, in this case, as it might, had put these warehouse receipts in circulation, an actual fraud would have been committed, and the evil intended to be prevented by the statute, consummated.

By the issuance of the receipts to the bank it was furnished with the means of perpetrating a fraud, and this is one of the objects this statute sought to prevent. Any other construction would open the door to unlimited fraud, and render nugatory the protection attempted to be afforded to transactions through the public warehouses of the State by the statute.

It follows, that, as touching the question of the guilt or innocence of the defendant, the intent with which the receipts were issued by him was immaterial. The intent necessary to be found to constitute this offense, related alone to whether defendant intended to issue the receipt knowing it to be false. Thus far the common law doctrine, that every criminal offense consists of the joint operation of act and intent, enters into and must be considered as applying to statutory offenses. (Bishop on Stat. Crimes, 351-361.) If such receipts were issued by the defendant, he knowing that the property therein represented was not in fact in store as therein designated and described, the crime created by this section of the statute, as it relates to the issuance of such receipts, was committed. As before stated, it is immaterial whether the defendant intended a fraud upon the bank or other persons, if, in fact, his act, knowingly committed, was within the prohibition of the statute. This principle has found repeated recognition in this and other courts, in prosecutions for violations of the Dram-shop act and other acts. *McCutcheon* v. *People,* 69 Ill. 601, and cases cited; *State* v. *Moore,* 52 Iowa, 509; *Gardner* v. *People,* 62 N. Y. 399; *Halstead* v. *State,* 12 Vroom, 552.

The Supreme Court of Iowa, in *State* v. *Stevenson,* 52 Iowa, 701, held, upon the same principle, that when a warehouse-man shipped grain out of his control, for which he had given a receipt, leaving the receipt outstanding, he was criminally liable under a similar statute, although the grain was so shipped with the knowledge of and without objection by the holder of the receipt. The court said: "It is evident, from this whole section, that it is for the protection of the community as well

as the protection of the holder of the voucher. It is clear that Petrie, (such holder,) in this case, with the receipt in his possession, might perpetrate a fraud upon third parties, the grain not being stored with the defendant, as stated in the receipt. The defendant could not, innocently, under the statute, with such a receipt outstanding, ship the wheat beyond his control, even in the presence of Petrie, and with his verbal assent. Such an act would furnish Petrie the means of perpetrating a fraud, which it is one of the objects of the statute to prevent."

It is urged, with great persistency, that the transaction here was a mere attempt to create a lien upon the property of the defendant, in the nature of a mortgage or pledge thereof, and that therefore the act of defendant in making and delivering said receipt can not be deemed the issuance of a warehouse receipt, within the meaning of said act, and also, that the statute does not contemplate the issuing of warehouse receipts for the property of warehousemen, but only for property deposited or stored in such public warehouse by others. It is highly probable, if a holder of these receipts was seeking to recover possession of the property therein named, or enforce some right thereunder, as against the assignee of the defendant, or others having liens thereon, he having notice of the facts as here shown, would be bound by the transaction as it truly occurred between the warehouseman and the person to whom it issued, and the principle laid down in *Fishback* v. *Van Dusen et al.* 33 Minn. 111, cited by counsel for plaintiff in error, become applicable. No such question here arises. The warehouse receipts, as we have seen, as issued, purported to be for grain stored by the bank with the defendant, in his public warehouse, designated and marked as shown by the receipts, when in fact no such deposit had been made. Nor is it true, as the contention of counsel would indicate, that the receipts represented produce belonging to the maker thereof. Nor can it make any difference in the criminal responsibility of the defendant, under this statute, that such receipts might

have been intended by the parties to operate as a pledge or mortgage of the defendant's property, or that the officers of the bank knew, or might have known, that no such articles of property as therein described were in the custody of the defendant.

The instructions asked on behalf of the defendant, being based on the theory of counsel for plaintiff in error, that it was necessary for the People to show, and for the jury to find, that the receipts were issued by the defendant with a fraudulent intent, were properly refused.

We have seen that evidence tending to show that the defendant did not intend the perpetration of a fraudulent act, is not admissible in justification, or as exculpating the defendant from punishment for the alleged offense. Was it admissible for any purpose? If so, it was competent to be considered by the jury for such purpose, and its exclusion was error. While the penalty is denounced against any warehouseman of a public warehouse committing the acts prohibited by the statute, and no excuse can be heard that a fraud was not intended, yet a wide discretion is left by the statute to the jury or court to determine what penalty shall be inflicted in the particular case. That the legislature did not deem all persons guilty of violating the provisions of said act as deserving of a like punishment, is manifested by the fact that the penalty inflicted may, in the discretion of the jury, be for any term not less than one nor more than ten years. The purpose and object of punishment in criminal cases is stated to be, to deter others from crime, and thus protect the community, as well as, when the life is not taken, to reform the offender. On the one hand, punishment will not be inflicted unless deserved, while on the other hand, it will not be imposed unless for conservation of the public good. (1 Bishop on Crim. Law, sec. 210.) And the punishment should always be commensurate with, but never in excess of, the purposes of the law as thus understood. The degree of punishment to be inflicted is, in the first in-

stance, a matter for legislative control; but when the legislature has prescribed punishment in the alternative, or within certain defined limits, thereby vesting jurisdiction in the courts to determine which, or, within the limits fixed, what, penalty shall be inflicted in the particular case, the court is called upon to determine what punishment the turpitude of the offense proved, on the one hand, and protection to society on the other, demand.    It was not within the legislative contemplation that all persons convicted under this act should receive the same punishment.    One may be sentenced for a term of one year, and another for ten years.    One may have been guilty of a technical violation of the statute, involving no considerable degree of moral turpitude, and from which no considerable injury could be inflicted upon the public; the other may have committed the offense under the most flagrant circumstances, showing a willful and deliberate purpose to inflict injury.    In such case, the jury must determine what, within the time prescribed by the legislature, is adequate punishment.    This, manifestly, can be justly and properly done only by a consideration of the facts and circumstances attendant upon its perpetration, and which characterize the purpose and motive in and effect of its commission.    If the evidence is to be confined to the mere proof of the issuance of the false receipt by the public warehouseman, what is there upon which to determine what, within the limit, shall be his punishment?    Obviously, nothing, unless it be permissible to prove, in aggravation or mitigation of the punishment, the immediate attendant circumstances of its issue.    This, we think, may be done.    It was, we think, competent for the defendant to prove the circumstances under which the receipts were issued and delivered, as bearing upon the turpitude of the offense, and for the jury to consider the same in determining the measure of punishment to be inflicted.    Such evidence must necessarily be controlled by instructions, as in other cases where evidence is competent and admissible for a particular purpose.

We are of opinion that the court erred in holding that the evidence tending to show the purpose and intent by which the defendant was actuated in the commission of the offense, was improper to be considered by the jury in mitigation of the penalties to be by them imposed. Nor can we say, if it had been submitted, that the term fixed by the jury for which the defendant should be confined in the penitentiary, would have been the same. Its exclusion for the purpose indicated, was, we think, prejudicial error.

For the error in this regard, the judgment of the Criminal Court is reversed, and the cause remanded for further proceedings.

*Judgment reversed.*