## ALLEN JACKSON v. STATE.

No. A-3820. Opinion Filed Jan. 6, 1923.
(211 Pac. 1066.)

(Syllabus.)

1.  **Statutes—Title of Act—Sufficiency.** It is not necessary for the title to an act of the Legislature to embrace an abstract of its contents. It is sufficient if the title contains a reasonable intimation of the matters under legislative consideration.

2.  **Same—Offenses and Penalties.** A title need not disclose the means and instrumentalities provided in the body of the act for accomplishing its purpose. Provisions reasonably necessary for attaining the object of the act expressed in the title are considered as included in the title. It is ordinarily not feasible or required, that the title to an act should set forth the nature and character of the penalties for which provision is made in the body of the act.

3.  **Same—Punishment Within Scope of Act Designating Crime.** Punishment is so closely related to the general object of an act making anything criminal as to be clearly within its scope.

4.  **Larceny—Automobiles Withdrawn from Operation of Grand Larceny Statute—Law Prescribing Punishment for Felonies not Applicable to Automobile Thefts.** (a) By chapter 102, Laws 1919 (Comp. St. 1921, § 2120), automobiles and automotive driven vehicles were withdrawn from the operation of the general grand larceny statute.

    (b) The punishment for felonies prescribed by section 1507, Comp. St. 1921, cannot apply to automobile theft, for the reason that the Legislature, by the 1919 act, prescribed differently.

5.  **Trial—Instructions as a Whole—Charge on Circumstantial Evidence not Misleading.** Instruction on circumstantial evidence examined, and it is held: (1) That instruction on circumstantial evidence should have been given in this case; (2) that such instruction, considered in its entirety, and in connection with the instructions given, is not misleading nor prejudicial.

6.  **Trial—Larceny—Required Instruction on Explained Possession of Stolen Property.** Where there is evidence tending to explain the possession of defendant of stolen property, the trial judge should give an instruction covering this theory of defense. Such theory is not covered by an instruction relating wholly to inferences of fact arising from unexplained possession.

7. **Evidence—Res Gestae—Declaration of Accused Explaining Possession of Stolen Property.** Any declaration made by the accused explaining the reason or character of his possession of alleged stolen property, if made while the possession lasts, is admissible as part of the res gestae for or against him.

Appeal from District Court, Garvin County; Geo. S. March, Judge.

Allen Jackson was convicted of theft of an automobile, and he appeals. Reversed and remanded.

Allen Jackson, hereinafter referred to as defendant, was convicted, in the district court of Garvin county, of the crime of theft of an automobile, and his punishment fixed as above stated.

The evidence adduced at the trial of said cause is substantially as follows:

On August 8, 1919, J. R. Parks, a merchant at Doyle, Okla., owner of the alleged stolen car, a Ford roadster, 1918 model, after sundown, went in the car to a picnic at Foster, Okla., left his car on the picnic grounds, and when he went after it about midnight it was gone. The next time Parks saw the car was at Wichita, Kan., at the police station, about the 22d of August. When he lost the car it was fairly new looking, but when he found it it was dirty, and had a spring broken. Parks testified that this was the same car he had lost at the Foster picnic; that the engine number had been changed by filing two numbers off; that he never knew defendant, and never saw him until he saw him in jail at Wichita, Kan.

D. C. Stucke testified that he lived at Wichita, Kan., and was a police officer, a plain clothesman assigned to look after stolen automobiles; that he saw defendant on August 17, 1919, at the police station; that defendant came after his car, which witness had picked up on August 16th on East Douglas avenue in Wichita, Kan., a Ford roadster, 1918 model; that the number on the car was changed and the tag wired on, and the car was muddy, and the front spring broken;

that defendant said it was his car; that he had bought it at Pauls Valley from a boy that was in the National Guard; said the boy's name was E. L. Herbert, or something like that. On cross-examination the witness Stucke testified that defendant came to the police station voluntarily, and asked about the car, and told what his name was, and that he was from Pauls Valley.

Charles F. Worley testified that he was the sheriff of Garvin county; that he remembered the Foster picnic, which was on Friday, August 8, 1918; that witness attended the picnic, and left a little before sundown; on Saturday evening he learned about the car being stolen; he afterwards got a telegram from Wichita, Kan., got a warrant for defendant, got on the train, and went to Wichita; this was on Friday or Saturday following the Foster picnic; got defendant and the tag that had been taken off the car, and brought the tag back; started back with defendant, and got as far as Paoli; had defendant handcuffed, and let him go to the toilet, and he raised the window and jumped out of the window and got away; that was about 2 o'clock in the morning, Saturday morning; that next time witness saw defendant, defendant was in Nebraska, about the 1st or 2d of November following; at that time witness brought defendant back to Pauls Valley; witness had a conversation with defendant as to how he came in possession of the car on the train between Wichita and Pauls Valley; defendant told witness he had bought the car on July 20th from a fellow by the name of Hubert, and gave $250 for it; witness turned the tag that had been taken from the car over to Ike Mitchell. On cross-examination witness testified that in the conversation he had with defendant on the train coming back from Wichita defendant told witness that he (defendant) was up there working for somebody; that the place where the Foster picnic was held was in Garvin county, Okla.

Earl Dean and Pat Evans, for the state, testified that after sundown on the night of Friday, August 8, 1919, they were at the picnic at Foster, Okla., and saw the defendant there.

Billy Russell, witness for the state, testified that he lived at Elmore, Okla., that some time during the year of 1919 he traded to the defendant a Ford touring car, 1916 model; that witness had applied for a license tag, but had not received the same, and agreed to call the defendant up when he got the tag from the highway department; that about midnight or after on the night of August 8, 1919, the defendant came to his house and inquired about the tag; defendant had with him a roadster car in front and an old touring car behind; some one was with him, but the witness did not know who it was; defendant said that he had traded the car which he had gotten from witness off for a roadster, and asked the witness for a license tag, which witness had not yet received; at a later date defendant again telephoned the witness about the tag, and said that he was going away to Shawnee and Oklahoma City, and did not tell witness that he was going to Wichita, Kan., nor ask that the tag be sent there.

Ike Mitchell, for the state, testified that he lived near Antioch, Okla., and had known defendant seven or eight years; that in the year of 1919 he owned a Ford car, and had a license number or tag number on it; that in August, 1919, witness lost his tag number, and that he afterwards recovered the same from Charley Worley, sheriff of Garvin county; that he lost his tag about 20 days before defendant left the county.

Miss Lee Gardenheim, witness for the state, testified that she lived at Antioch, Okla.; that she was a school-teacher, and that on the night of August 8, 1919, she was in the home of Allen Jackson, with his wife and two sick children, twins, about 18 months old; that Allen Jackson said he was working in the broom corn; that he had not been there during the day, was not at home for supper that night, but came in about 11:30 or 12 o'clock that night; witness was present when Allen Jackson again returned home on the next night; on Sunday morning defendant took the witness in a Ford roadster to her home 4½ miles away; he drove the car through Antioch, a country town with several little stores in it.

Bill Elium, for the state, testified that he had lived at Pauls Valley for 12 years; that he had formerly lived about three miles from defendant and his father, and knew defend-

ant intimately; that on Friday August 8th he saw Allen Jackson and a boy named Wiley Hulbert, who was about 18 years old, together in Pauls Valley, Okla.; that they got into a Ford car at the depot, and went west with two women who came in from Oklahoma City; about sunup the next morning was the next time he saw defendant, who then had a "tolerably new" Ford roadster; defendant told him that he had traded the old Ford touring car for the roadster, and had given $25 difference, and that there was nothing crooked about the deal; on Saturday night witness went with defendant in the roadster through the main streets of Pauls Valley, Okla., to Lone schoolhouse, about 9 miles southwest of Pauls Valley; the roadster was the same car in which defendant had appeared on Saturday morning, and in which he had taken witness and other hands back to work at the broom corn threshing at which they had been engaged on the previous Friday, the 8th of August; that after defendant's arrest, defendant approached witness and wanted to know if witness would swear that he had seen defendant buy this car from a soldier boy at Pauls Valley and pay $250 cash for it; that witness refused. Witness denied that in December, or at any other time, he was in Mr. Stanley's office, and denied that in the presence of Allen Jackson, old man Jackson, and Mr. Drigger he had a conversation with Mr. Stanley in his office about this case, in which witness said that Allen Jackson told him on Friday afternoon, August 8th, he would take two men to Foster, Okla., for $10, see his babies, return to Pauls Valley, and finish the threshing the next day; witness denied that in such conversation he said that on Saturday night, August 9th, he saw Allen Jackson in front of the bakery in Pauls Valley, and that Allen Jackson there told him that he had bought a Ford roadster from a soldier man and paid $250 for it, and asked witness to drive the old five-passenger touring car back home, and let defendant drive the roadster, and that this was done; witness also denied that in that conversation witness stated that Manuel Jackson, a deputy sheriff, told witness that, if witness swore to the statements above accredited to him, witness would be slapped in jail where defendant was, and denied that he was ever in Mr. Stanley's office in his whole life.

Isaac Smith, for the state, testified that he lived in Pauls Valley, and had lived there about three years; that he was driving a truck for a lumber company; that he was about 20 years old; that he knew Bill Elium and Allen Jackson; that on Saturday morning, August 9th, he saw defendant on one of the main streets of Pauls Valley with one Bill Elium and McCurley; that he went with them in a Ford roadster, practically new, to Bill Elium's house; that from there they went to the broom corn fields to work; that Bill Elium asked defendant where he had got the Ford roadster, and that defendant said that he traded an old Ford for it down near Wynnewood; that Bill Elium told defendant that he was "just a damn liar," that he had stolen that car.

On behalf of defendant, Clarence Butler testified that he lived at Antioch; was 26 years old; had known defendant some 8 or 10 years; that on Friday night following the Foster picnic witness saw Allen Jackson in Pauls Valley, over by the old courthouse, about 8 o'clock at night, standing on the sidewalk; that a stranger was with defendant, and a Ford roadster was standing near; that witness then went down town and walked around some, and then went to a show, and did not see defendant any more that night; that he saw defendant the next day in possession of a Ford roadster, and had a conversation with defendant, to the introduction of which conversation the state objected, to which defendant excepted, and counsel for defendant thereupon offered to prove that witness would testify, if permitted to answer, that Allen Jackson told him he had bought the car from the man that he saw him talking to on the night before, and that he paid the sum of $250 for the car; that on the next day, Sunday, he saw Allen Jackson over at Antioch, and went with defendant to a fellow's place over at Whiteview; that he did not know the name of the fellow; that they were driving in a Ford, and it was along about 12 o'clock; that he got with Allen Jackson that day at the schoolhouse; that there was some kind of a meeting going on at the schoolhouse, but witness did not remember what it was. On cross-examination, witness testified that he and defendant had been pretty close friends, and had been together "a lot;" that the fellow he saw defendant talking to in Pauls Valley wore a soldier's uni-

form, and looked to be 25 or 30 years old; witness did not pay much attention to his looks; that Foster is about 20 miles southwest of Pauls Valley, and Antioch about 12 miles west; that Antioch is 9 or 10 miles from Foster; that Elmore is about 6 or 8 miles from Foster.

H. F. Hall testified for defendant that at the time of the alleged theft he was secretary of the state training school, 4½ miles south of Pauls Valley, Okla.; that the brother of witness' wife was married to defendant's sister; that on August 9, 1919, a man came to him at the state training school about three or four o'clock in the afternoon, dressed in the uniform of a soldier, in a Ford roadster; but witness was not permitted to testify that the soldier tried to sell him the Ford roadster for $300. Witness further testified that about 8 o'clock that night he went to Pauls Valley and saw defendant and this soldier man in front of the Ford Garage, and had a conversation with them; but witness was not permitted to testify that in that conversation he told defendant that this same man had tried to sell witness that car that afternoon, and that defendant replied that the man wanted too much money for the car, and that he was trying to get him to take a different sum; that the man and the Ford roadster is the same that he had seen at the training school that afternoon; that the soldier boy appeared to be 25 or 30 years old, pretty good size, weighing about 160 pounds, rather tall, but he had never seen him since the Saturday night he saw defendant talking to him; witness thinks he was light complexioned, did not remember what kind of coat he had on, or what kind of shoes, but did remember he had on leggings.

J. F. Jackson, witness for defendant, testified that he was the father of defendant; that defendant lived on a farm near the witness with his wife and two babies; that at the time of the alleged occurrence defendant was running a broom corn thresher; that defendant was at home a short time on the night of August 8th, and came home again Saturday night, August 9th; that on Saturday night, about 10 or 11 o'clock, defendant came home and told him about making a deal for an automobile; but witness was not permitted to testify that defendant had told him that he had bought the automobile in Pauls Valley for $250, and that he thought that he had

gotten a good bargain. Witness further testified that on Sunday morning he saw the old Ford car and the Ford roadster at his son's home; that defendant took Miss Lee Gardenheim home in the Ford roadster. Witness and the witness B. F. Drigger both testified that they were present in Mr. Stanley's office when a conversation took place between Bill Elium and Mr. Stanley, in the presence of the witness and Allen Jackson, in which Bill Elium said that on Friday, August 8th, defendant told Elium that he was going to Foster to take two men there for $10; that he would come back by Antioch with some medicine for his babies; and that defendant did come to Elium's house the next morning between sunup and daylight, and that Elium and defendant threshed broom corn all day Saturday, came back to Pauls Valley late in the evening, and that after the show that night Elium again saw defendant in Pauls Valley, and that defendant told Elium that he had bought a Ford roadster off a soldier man, and wanted Elium to drive the old Ford car back home, and that defendant could drive the roadster; that Elium got into the old Ford car, and defendant got into the roadster, and they went out to defendant's place and left the old Ford, and defendant took Elium in the roadster out to where he wanted to go; that in said conversation Bill Elium stated that he had talked wtih Mr. Jackson, the deputy sheriff, and that the deputy sheriff told him that, if he so testified in court, he would be in as bad a shape as defendant. On cross-examination, witness testified that he did not know where defendant had been during the day Friday until he came home about 11 o'clock that night; that witness left defendant's home about 12 o'clock that night, and he did not know what defendant did after that until he came in Saturday night; that he did not know what kind of a car defendant drove home in Friday night; that he did not know how long defendant kept the roadster around there with reference to the time defendant took it to Wichita, Kan., but supposed it was about the next Friday, a week.

A. N. Strong, a witness for defendant, testified that on Friday, August 8th, in the afternoon, after dismissing the school which he was teaching at the Lone schoolhouse, he

started towards Pauls Valley, and met defendant traveling west towards Elmore in an old Ford car witth some men, or two or three men (witness did not notice how many), but that no women were with them at that time.

The defendant offered the testimony of Mrs. Allen Jackson, his wife, who testified that on Friday night, August 8th, the defendant came home from broom corn threshing about 10 o'clock, sat up with the children, giving them medicine until about 5 o'clock Saturday morning, when he returned to his work, and again came in between 9 and 10 o'clock Saturday night, when she had a conversation with him about buying a car; but the witness was not permitted to testify that on Saturday night the defendant told her that he had bought a Ford roadster in Pauls Valley for $250, and that he got a bargain in the same; witness saw the old car and the new Ford roadster which had not been there before on the following day, Sunday; but she was not permitted to testify that she again had a conversation with defendant on Sunday, August 10th, as to where he got the Ford roadster, and that in such conversation her husband again told her the same account as to where he had gotten the car, and that he thought that he had made a good trade in buying the same; that on Sunday morning defendant took Miss Gardenheim home in the Ford roadster. On cross-examination, witness testified that she did not know where her husband had been on Friday prior to the time he came in about 11 o'clock that night; that there was not anything said about the Foster picnic; that she was with defendant in Nebraska at the time he was arrested up there.

Finnis Johnson, a witness for defendant, testified that on Friday, August 8th, he saw defendant at the threshing, and that he was traveling in a five-passenger Ford; that on Saturday, August 9th, defendant was again at the same place threshing broom corn and that he came and went in the same old five-passenger Ford car which he had used on the preceding day. On cross-examination, witness testified that he did not know how he fixed the Saturday that he saw the old Ford roadster out there as the 9th day of August.

Noah Wade, a witness for defendant, testified as did Finnis Johnson, and fixed the date of his seeing defendant

with the old five-passenger Ford car as being August 9th, by a check given by witness to defendant on that day as pay for the broom corn threshing.''

John M. Stanley and Wayne H. Lasater, for plaintiff in error.

The Attorney General, for the State.

MATSON, J. (after stating the facts as above). First, it is contended that this prosecution must fail because the act of the Legislature upon which it is based is in violation of section 57, art. 5, of the Constitution. Said section is as follows:

''Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes; and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length: Provided, that if any subject be embraced in any act contrary to the provisions of this section, such act shall be void' only as to so much of, the law as may not be expressed in the title thereof.''

The title and the act (chapter 102, Sess. Laws 1919 [section 2120, Compiled Statutes 1921]) are as follows:

''An act making it a felony to steal an automobile or other automotive driven vehicle.

''Be it enacted by the people of the state of Oklahoma: * * *

''Section 1. Any person in. this state who shall steal an automobile or other automotive driven vehicle shall be guilty of a felony, and upon conviction shall be punished by confinement in the state penitentiary for a term of not less than five (5) years, nor more than twenty (20) years.''

Counsel for defendant urge that the foregoing act violates such constitutional provisions for the following reason: That

the title to the act does not clearly express the subject of the act, in that no reference is made in the title to the punishment prescribed in the body of the act. Before treating of this objection to the constitutionality of this act, it is pertinent to make reference to some general principles on constitutional and statutory construction heretofore alluded to in opinions of this court:

"It is * * * well settled that a liberal construction should be applied to the acts of the Legislature and constitutional provisions as well in determining whether or not such enactments violate constitutional provisions, and only when acts of the Legislature are clearly contrary to the Constitution should the court hold them invalid."

"It is a * * * rule, recognized by all the courts, that where a statute is subject to two constructions, one of which would render it invalid, the other sustain its validity, that construction which sustains the validity of the act should be adopted by the court, and this rule is equally applicable to titles to legislative enactment."

In re Ambler, 11 Okla. Cr. 449, 148 Pac. 1061.

"It is a well-known canon of construction that, where the constitutionality of a statute is involved, it must appear * * * to be unconstitutional beyond a reasonable doubt. To doubt its constitutionality, is to uphold it." State v. Wheatley, 20 Okla. Cr. 28, 200 Pac. 1004.

Also, in construing section 57, art. 5, supra, this court has held:

"(a) It is not necessary for the title to an act of the Legislature to embrace an abstract of its contents. It is sufficient, if the title contains a reasonable intimation of the matters under legislative consideration, to state the subject of the bill in general terms, and with fewest words, in accordance with the general custom, to which the framers of the Constitution intended the Legislature to conform.

"(b) When there are numerous provisions having one general object, the title is sufficient if it fairly indicates the general purpose of the act. The details providing for the accomplishment of such purpose are to be regarded as necessary incidents."

In re Powell, 6 Okla. Cr. 495, 120 Pac. 1022.

"Section 57, art. 5, Const., providing that an act of the Legislature shall embrace but one subject, etc., has reference only to the body of the bill. The provision as to the explicitness of the title to the bill is directory and is not fatal to a measure simply because the title is broader than the act itself." In re Ambler, supra.

Dealing more specifically with the objection urged in the instant case against the constitutionality of this act, it is stated as a general rule of statutory construction, in 25 R. C. L. p. 858, § 104, that:

"A title need not disclose the means and instrumentalities provided in the body of the act, for accomplishing its purpose; where all the provisions are reasonably necessary as means for attaining the object of the act indicated by the subject which is expressed in the title they are considered as included in the title as subdivisions of the general subject there stated. It is ordinarily not feasible or required that the title to an act should set forth the nature and character of the penalties for which provision is made in the body of the act."

In Cohn v. People, 149 Ill. 491, 37 N. E. 62, 23 L. R. A. 821, 41 Am. St. Rep. 304, the Supreme Court of Illinois held:

"The punishment of imitators or counterfeiters of trade-marks may be provided for under the title of an act 'to protect association, unions of workingmen, and persons in their labels, trade-marks, and forms of advertising.' "

In the body of the opinion it is said:

"It is next insisted that the statute is in violation of section 13 of article 4 of the Constitution, providing that 'no

act hereafter passed shall embrace more than one subject, and that shall be expressed in the title.' The title of the act is 'An act to protect associations, unions of workingmen and persons in their labels, trade-marks and forms of advertising.' It is said by counsel that, while there are provisions of the act designed to protect trade-marks, the provisions of sections 1, 2, 4, 6, and 7 relate to the punishment of imitators or counterfeiters, and those using such imitations or counterfeits, and are enacted for protection of the owners of the labels, trade-marks, or forms of advertising, and therefore are not within the title of the act. As said in Larned v. Tiernan, 110 Ill. 177: 'The decisions concur in laying down substantially the rule that in consistency with that provision there may be included in an act means which are reasonably adapted to secure the objects indicated by the title.' See cases there cited. When the general purpose is declared in the title, the means for its accomplishment provided by the act, will be presumed to be intended as a necessary incident. O'Leary v. Cook County, 28 Ill. 534; People v. Hazelwood, 116 Ill. 319; McGurn v. Chicago Board of Education, 133 Ill. 123. The penalties for counterfeiting and use of imitations and counterfeits, while intended as punishment for the violation of public law, are imposed to protect, in the language of the title, associations, and others entitled to use labels, trade-marks, and forms of advertisement, in the use thereof. The objection is not well taken.''

In Sykes v. People, 127 Ill. 117, 19 N. E. 705, 2 L. R. A. 461, the same court held:

''Section 25 of the Illinois Warehouse Act of 1871, imposing a penalty for issuing receipts for property not actually in store, is germane to and embraced within the title: 'An act to regulate public warehouses, and the warehousing and inspection of grain and to give effect to article 13 of the Constitution of this state.' ''

In the body of the opinion it is said:

''The statute before referred to, and upon which said counts were predicated, is the twenty-fifth section of the act of 1871 (Starr & Curtis, par. 180, p. 1975), which is as fol-

lows:   'Any warehouseman of any public warehouse who shall be guilty of issuing any warehouse receipt for any property not actually in store at the time of issuing such receipt, or who shall be guilty of issuing any warehouse receipt in any respect fraudulent in its character either as to its date, or the quantity, quality or inspected grade of such property, or who shall remove any property from store (except to preserve it from fire or other sudden danger) without the return and cancellation of any and all outstanding receipts that may have been issued to represent such property, shall, when convicted thereof, be deemed guilty of a crime, and shall suffer, in addition to any other penalties prescribed by this act, imprisonment in the penitentiary for not less than one and not more than ten years.'

"It is urged that this section of the statute is void, because the provisions imposing a penalty for issuing such warehouse receipts, etc., is not embraced in the title of the act. The act is entitled 'An act to regulate public warehouses and the warehousing and inspection of grain, and to give effect to article 13 of the Constitution of this state.' Section 6 of the article referred to provides: 'It shall be the duty of the General Assembly to pass all necessary laws to prevent the issue of false and fraudulent warehouse receipts, and to give full effect to this article of the Constitution,' etc. It is, we think, manifest from the mere statement, that the section under consideration is germane to the purposes of the act as stated in its title, and not, therefore, obnoxious to the objection. People v. Loewenthal, 93 Ill. 191; Magner v. People, 97 Id. 320."

In the case of Republic Iron & Steel Co. v. State, 160 Ind. 379, 66 N. E. 1005, 62 L. R. A. 136, the Supreme Court of Indiana said:

"It is first submitted that, because the title of the act makes no mention of penalties for the violation of its provisions, the penalty clause of section 2 * * * is void under article 4, § 19, of the Indiana Constitution, which provides that 'every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title.' The evident purpose in requiring a title to a legis-

lative proposition was thereby to convey notice of the general subject to be affected to those who are called on to act upon it, and thus to prevent deception by the blending of incongruous subjects in the same act. It is only necessary that the general subject of the act be expressed—that is, be indicated—by the title. It is not essential that the means and methods provided in the act for the securing of intended results and ends shall be set forth in the title. The Constitution is satisfied if the constituent means embraced in the body of the act have a proper relation to each other and to the subject expressed in the title, and are consistent, in tending to carry forward and to accomplish the general purpose indicated by the title and intended by the legislation. Isenhour v. State, 157 Ind. 517, 523, 62 N. E. 40; Lewis v. State, 148 Ind. 346, 47 N. E. 675; Benson v. Christian, 129 Ind. 535, 29 N. E. 26; Indianapolis v. Huegele, 115 Ind. 581, 18 N. E. 172. No act of the Legislature can be made effective without some reasonable provision for its enforcement, and the assessment of a penalty for noncompliance has long and many times been recognized by the General Assembly and the courts of this state as an efficient and reasonable means of securing obedience.''

See, also, note to State v. Peyton, 234 Mo. 517, 137 S. W. 979, in Ann. Cas. 1912D, 157, where numerous cases are cited supporting the text above quoted from 25 R. C. L.

The constitutional provisions of the various states from which the cases herein cited are taken are substantially identical with section 57, article 5, of the Constitution of this state.

The reason for the rule appears to be that a penalty or punishment provided in a statute is regarded as necessary to accomplish its purpose, and therefore germane to the subject where a crime is defined by law. It is only necessary that the title to the act shall indicate the subject of the act in a general way, and whatever details enter into the accomplishment of this general subject may be embodied in

the act without specific reference in its title. Without some provision for punishment in an act making certain · action criminal, or even regulatory, the act itself would be nothing more than a mere recommendation to the public.    Punishment is so closely related to the general object of an act making anything criminal as to be clearly within its scope.  This court is therefore of the opinion that the subject of the act here in question is expressed in the title with sufficient definiteness and clearness as not to be violative of that part of section 57, art. 5, of the Constitution of this state requiring an act of this kind to embrace but one subject, which shall be clearly expressed in its title.

The determination here made of the first contention of defendant's counsel of necessity disposes of the questions advanced that the prosecution should have been under the general statute defining grand larceny, or else the punishment applicable to section 2120, Compiled Statutes 1921, is that provided in section 1507, Compiled Statutes 1921, which is as follows:

"Except in cases where a different punishment is prescribed by this chapter, or by some existing provisions of law, every offense declared to be felony is punishable by a fine not exceeding one thousand dollars, or by imprisonment in the state penitentiary not exceeding two years, or by both such fine and imprisonment."

Automobiles and automotive driven vehicles were, by act of 1919 (chapter 102, supra), withdrawn from the operation of the general grand larceny statute.   The punishment for felonies prescribed by section 1507, supra, cannot apply, for the reason that the Legislature, by the 1919 act, prescribed differently.

It is next urged that the trial court erred in giving the following instruction on the law of circumstantial evidence:

"You are instructed that the state relies for a conviction in this case upon what is known as circumstantial evidence, and in this matter you are instructed that, to warrant a conviction upon circumstantial evidence, each fact necessary to the conclusion sought to be established—that is, the guilt of the defendant—must be proved by competent evidence, beyond a reasonable doubt, and that all the facts and circumstances proven should not only be consistent with the guilt of the accused, but consistent with each other and inconsistent with any other reasonable hypothesis or conclusion than that of his guilt, and sufficient to produce in your minds a reasonable moral certainty that the accused committed the offense charged against him. And you are instructed that, when the circumstances are sufficient under this rule herein given you, they are competent and are to be regarded by the jury as competent for your guidance as direct evidence."

The foregoing instruction is copied verbatim from an instruction approved by this court in the case of Carter v. State, 6 Okla. Cr. 232, 237, 118 Pac. 264. In this case the evidence relied upon for a conviction was wholly circumstantial; an instruction on circumstantial evidence was therefore proper. Matthews v. State, 8 Okla. Cr. 676, 130 Pac. 125. While the instruction complained of might have been couched in more positive language, we think its meaning reasonably clear, and, when considered in its entirety and in connection with the other instructions given, the jury was told in plain and unambiguous language of the state's burden to prove the defendant guilty beyond a reasonable doubt, and that the circumstantial evidence must be so conclusive as to exclude any hypothesis other than that of defendant's guilt.

Another instruction to the following effect is complained of:

"You are further instructed that, if you find from the evidence beyond a reasonable doubt that the car in controversy was stolen from its owner, J. R. Parks, and that soon thereafter said car was found in the possession of the de-

fendant, and that his possession thereof was unexplained, a matter which you are the sole and exclusive judges of, then it is proper for you to take this fact into consideration, together with all the other facts and circumstances in this case in determining whether or not the defendant is guilty of the crime charged in the information. In this connection, however, you are instructed that the unexplained possession of recently stolen property, standing alone, is not sufficient to sustain the crime charged against the defendant, but, as herein stated, is only a circumstance which you may take into consideration with all the other facts and circumstances in this case in determining whether or not the defendant is guilty of the crime charged.''

The particular objection is stated by defendant's counsel as follows:

''The vice of this instruction lies chiefly in the fact that it singles out and makes prominent, without reason therefor, one of the theories and points of evidence on which the state chiefly relies for a conviction herein, while it does not set forth conversely and affirmatively the theory and evidence upon which the defendant relied as to the recent possession of the alleged stolen property; but by inference, and to the prejudice of the rights of the defendant, the court instructs the jury that there was no evidence upon the part of the defendant tending to explain his possession of the said property and justify an affirmative statement of his theory and evidence, and instructing the jury to acquit the defendant if the jury found that such evidence were true.''

We think the trial court erred in giving the latter instruction in this case.

The possession of the alleged stolen automobile was not wholly unexplained by the defendant even under the state's theory. The state offered the evidence of several witnesses to the effect that on different occasions the defendant, while in the possession of the car, had given different and conflicting versions as to how he had obtained possession thereof.

The defendant offered other evidence (which was excluded) which, if admitted, would have tended to explain his possession of the car consistently with the explanation made by him at the time of his arrest.

By the foregoing instruction the trial judge indicated that there was no "explanation of possession" by the defendant. The fact that defendant did not testify in his own behalf would lead the jury to believe from the wording of the instruction that defendant had offered no explanation of his possession of the car, and that therefore his possession remained entirely unexplained, and that such circumstance should be weighed against him. Under the evidence the trial judge should have given an instruction on the law as applicable to "explained" rather than "unexplained" possession. The injurious effect of the foregoing instruction becomes more readily apparent in this case when considered in connection with the following assignment of error relative to the exclusion of certain statements alleged to have been made by the defendant in explanation of his possession of the alleged stolen car. Certain testimony offered by the defendant was rejected by the trial court, and proper exceptions taken to such action, and proper proffer of proof made in each instance. Concerning this assignment of error, the record is as follows:

"Q. State to the jury what was said between you and Allen Jackson or the soldier man there on that occasion?

"Mr. Williams, Prosecuting Attorney: We object to that as being incompetent, irrelevant and immaterial.

"The Court: Objection sustained.

"Mr. Stanley: Exception."

Thereupon the following was dictated to the reporter beyond the hearing of the jury, to wit:

"Mr. Stanley: If the witness were permitted to answer the question propounded to him by counsel for the defendant, he would say that about 8 or 9 o'clock in the evening of August that he drove in a car, in company with his wife, to the Ford garage in Pauls Valley, and that he saw Allen Jackson there in conversation with a soldier; that he was the same man who came out this afternoon and wanted to sell that roadster to me; that Mr. Jackson replied that 'He wanted too much for the car, and I am trying now to get him to take a certain sum for it.' "

Offered testimony of J. S. Jackson:

"Q. Did he make any statement to you when he came in home about making a deal for an automobile? A. Yes, sir.

"Q. What did he say about it, if anything?

"Mr. Williamson: I object to any statement made by this defendant to his father on the ground that it would be hearsay and self-serving.

"The Court: Objection sustained.

"Mr. Stanley: To which the defendant excepts."

Thereupon the following was dictated to the reporter, beyond the hearing of the jury, to wit:

"Mr. Stanley: The defendant says this witness, if permitted to answer the question propounded, would say that Allen Jackson came in home Saturday night on the night of the 9th of August, 1919, one day subsequent to the time it is alleged that he had stolen said automobile; that he would say that the defendant said that he had bought the automobile in Pauls Valley for which he had paid the sum of $250, and that he had gotten a bargain in the same."

Offered testimony of Mrs. Allen Jackson:

"Q. State to the jury what conversation you had with your husband in reference to a Ford roadster that he had bought and brought in that night.

"Mr. Osborn: Objected to on the ground that any conversation between Mrs. Jackson and her husband would be self-serving in its nature.

"Mr. Stanley: Possession of recently stolen property can always be explained.

"The Court: Objection sustained.

"Mr. Stanley: Exceptions."

Thereupon the following was dictated to the reporter beyond the hearing of the jury, to wit:

"Mr. Stanley: If this witness were permitted to answer the question above propounded, she would say that when her husband came in Saturday night, the 9th of August, the day subsequent to the day on which the automobile was alleged to have been stolen, that her husband told her that he had bought a Ford roadster from a man in Pauls Valley for which he paid $250, and that he got a bargain in the same.

"Q. State to the jury what the conversation was.

"Mr. Williamson: Objected to on the ground that it is incompetent, irrelevant, immaterial, and self-serving.

"The Court: Objection sustained.

"Mr. Stanley: Exception."

Thereupon there was dictated to the reporter beyond the hearing of the jury, the following, to wit:

"Mr. Stanley: If the witness were permitted to answer this question she would say that she and her husband had a conversation Sunday morning following the day on which the car was alleged to have been stolen and that her husband had gone on and told her where he had gotten the car, and that he thought he had made a good deal in buying the same."

The evidence offered by the witness Hall of the statement of defendant to him was inadmissible and properly excluded because the defendant was not shown to be in pos-

session of the car at that time. The evidence offered by the witnesses J. S. Jackson and Mrs. Allen Jackson was admissible, and should not have been excluded, as the statement to the wife was apparently made when J. S. Jackson was present.

Prof. Wigmore states the rule under which such utterances are admissible as follows (Wigmore on Evidence, vol. 3, § 1781, subd. 4):

"Recent possession of stolen goods raises a presumption that the possessor is the thief or robber or knowing receiver (as the charge may be). Even though the strict effect of this fact as raising a presumption and casting on the defendant the duty of producing evidence may be removed by his producing some evidence to the contrary, still the fact of possession remains for the jury's consideration as capable of the inference of guilt. Now the inference from the fact of possession will be stronger or weaker, according as the possession was not or was in good faith; if a possession in good faith can be made to appear, the inference that the possessor was himself the robber or the thief or the knowing receiver can hardly be strong. Thus, the total significance of the act of possession becomes material; and upon the principle of verbal acts the utterances of the person while in possession may be received as verbal acts (or, in the common judicial phrase, as 'explanatory of possession'), though not as hearsay assertions to evidence the fact asserted. On this principle it would be immaterial what the tenor of the utterance was—whether a claim or a disclaimer of ownership, or an explanation of finding or of purchase or of borrowing, provided only it indicated the intent of the possession. It would also be immaterial that it was made before arrest, or discovery of the goods, or claim made or suspicion raised, or that it was made after arrest or discovery or claim or suspicion, provided only that it was made during possession."

Underhill in his work on Criminal Evidence (section 302) says the following:

"Any declaration made by the accused explaining the reason or character of his possession, if made while it lasts, is admissible as part of the res gestae for or against him."

In Cheeves v. State, 18 Okla. Cr. 480, 196 Pac. 726, this court held:

"In a prosecution for larceny, what the defendant said in explanation of his possession of a part of the stolen goods, immediately upon its discovery with him, is a part of the res gestae, and as such admissible in evidence in his favor as well as adversely to him."

See, also, the following: Bryant v. State, 116 Ala. 445, 23 South. 40; People v. Cline, 74 Cal. 575, 16 Pac. 391; Lovett v. State, 80 Ga. 255, 4 S. E. 912; State v. Gabriel, 88 Mo. 631; Goens v. State, 35 Tex. Cr. R. 73, 31 S. W. 656.

The error in excluding this proffered evidence appears particularly prejudicial in view of the fact that the trial judge permitted the state by the witnesses Bill Elium and Isaac Smith to prove that defendant, on the very day the declarations were alleged to have been made to J. S. Jackson and Mrs. Allen Jackson, stated to them that he procured the Ford roadster in a trade with a man at Wynnewood, Okla., and gave $25 to boot, and his old Ford touring car. The alleged statement to Elium and Smith was directly in contradiction to what the defendant had stated to the officers at the time of his arrest.

Having permitted the state to prove this apparently contradictory statement, the defendant should have been allowed to show that at about the same time he made to others statements consistent with that made at the time of his arrest. The jury then would have had all the alleged utterances of the defendant concerning the explanation of his possession of the alleged stolen car before them, and would have been in a position to determine correctly, after considering all these cir-

cumstances, which of the witnesses to believe and which to disbelieve. Also the jury would have been in a position better to judge of the reasonableness of defendant's explanation of possession of the stolen property made at the time of his arrest.

Adhering to the views herein expressed, which find support in the weight of modern authority on the subject, we conclude that a new trial should be granted defendant.

For reasons stated, the judgment of conviction is reversed, and the cause remanded to the district court of Garvin county, with instructions to grant defendant a new trial, and for further proceedings not inconsistent with this opinion.

DOYLE, P. J., and BESSEY, J., concur.